# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-1601

_____

United States of America,

*Plaintiff - Appellee,*

v.

Walter Combs, also known as Victor Flenoy,

*Defendant - Appellant.*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 15, 2016
Filed: July 5, 2016

_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Walter Combs appeals from his conviction for conspiracy to possess with intent to distribute cocaine and for possession of a firearm in furtherance of a drug-trafficking crime. Combs was arrested following a reverse-sting operation conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in 2013.

Combs contends that the district court[1] erred by denying his motion to dismiss the indictment for outrageous government conduct and by refusing to instruct the jury on entrapment. We affirm.

I.

This case arose out of an ATF investigation into Kevin Nailor's illegal possession and sale of firearms. In June and July of 2013, ATF conducted controlled purchases of two handguns from Nailor through a confidential informant. During these encounters, Nailor told the informant that he led a crew that was planning to rob a marijuana dealer. In light of Nailor's criminal history and access to firearms, ATF decided to expand its investigation into Nailor to include the planned drug robbery.

The informant arranged a meeting on August 20, 2013, to introduce Nailor to ATF Special Agent Leon Edmond, working undercover. The purpose of the meeting was to assess whether Nailor actually had a robbery crew and, if so, to divert the crew to a sting operation. All of Edmond's meetings with the suspects were recorded.

Edmond presented himself to Nailor as a disgruntled courier for a Mexican drug cartel, and he described to Nailor a scenario consistent with other drug operations in the region. He explained that the cartel was not paying him enough money and that he was looking to hire a crew to rob a "stash house" used by the cartel. Edmond told Nailor that the cartel transported approximately eight kilograms of cocaine to a stash house in St. Louis every few weeks, and that after the cocaine arrived, he would be responsible for transporting up to two kilograms to Memphis, Tennessee. Edmond advised that he would not learn the location of the stash house

---

[1] The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

until the morning of the delivery, and he forecast that the house would be protected by two or three armed guards.

Nailor offered to commit the robbery for Edmond in exchange for five of the eight kilograms of cocaine. Nailor told Edmond that his crew, which included two others, was experienced with home-invasion robberies. Nailor also told Edmond that his crew would be prepared with "heavy shit . . . , some retarded looking shit," which Edmond understood to mean high-powered firearms. Edmond gave Nailor several opportunities to back out, but he maintained interest in the plan. Edmond and Nailor remained in contact after their meeting, and they agreed to meet again.

At a meeting on September 4, Nailor introduced Edmond to the other members of his robbery crew: Walter Combs and Shatondi Rice. Combs arrived first, and Edmond reviewed the robbery scenario for Combs and Nailor. Combs later told Edmond that the robbery was "what we've been waiting on." When Rice arrived, Edmond asked Combs to explain the plan. Edmond testified that he did so to make sure the suspects knew exactly what he was asking of them. Combs assured Edmond that the crew could handle the robbery, telling him "this is what we do," "we don't do shit but licks," and "we know how to case houses real good." A "lick" is a common slang term for robbery. "Casing a house" refers to conducting surveillance in preparation for a robbery.

Edmond and Nailor both recommended tying up the guards, but Combs proposed to kill them, reasoning that "a dead man can't talk." While discussing how they would conduct the robbery and what firearms they would bring, Combs likened their strategy to that used for a previous robbery in Wellston, Missouri. Combs then explained that he would sell his share of the cocaine as small quantities of crack cocaine. Edmond again gave the men a chance to back out; Combs rejected this opportunity and promised, "We gonna be the people you call every time."

-3-

Edmond met with Combs and Rice a week later. Combs then provided greater detail on the plan to rob the stash house, kill the guards, and sell his share of the cocaine. Combs also asked Edmond to rent a getaway vehicle, and told Edmond that he would obtain fake license plates so the vehicle could not be traced back to them. Edmond agreed, reasoning that providing a vehicle would allow ATF to arrest the suspects more safely at a remote location. Before leaving, Edmond again gave Combs and Rice an opportunity to back out, and neither did.

On September 17, 2013, Edmond called Nailor and told him the cocaine had arrived at the stash house. The robbery crew met again with Edmond to review final details for the robbery. Nailor, Combs, and Rice then left to pick up their weapons. The men returned approximately fifteen minutes later and followed Edmond to the rental vehicle at a nearby scrap yard. At the scrap yard, Combs removed two firearms from under the hood of his vehicle and handed them to Rice. Rice placed one in his waistband and the other inside the rental vehicle. While the group was supposedly waiting for Edmond to receive a call from the cartel, ATF agents arrived and arrested Nailor, Combs, and Rice. During the arrest, a loaded .22 caliber handgun fell out of Rice's waistband, and agents discovered another loaded .22 caliber handgun inside the rental vehicle.

A grand jury charged Combs with several offenses: conspiracy to possess with intent to distribute more than five kilograms of cocaine, *see* 21 U.S.C. §§ 841(a)(1), 846, and 841(b)(1)(B)(ii); possession of a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. §§ 924(c)(1); and witness tampering, *see* 18 U.S.C. § 1512(a)(2)(A). The district court denied Combs's motions to dismiss the indictment for lack of federal jurisdiction and for outrageous government conduct, and the case proceeded to trial. After the government presented evidence of the events described above, Combs testified in his defense. Combs claimed that Nailor pressured him into participating in the stash-house robbery, and that he agreed to participate only

because the robbery "was going to take [them] out of the ghetto." Combs admitted, however, that he helped to plan the robbery and that he intended to kill the guards.

The government moved *in limine* to prevent Combs from arguing he was entrapped. The court permitted Combs to present evidence of entrapment, but reserved decision on whether he was entitled to a jury instruction on the issue. At the conclusion of the evidence, the district court denied Combs's request to instruct the jury on entrapment, concluding that there was not sufficient evidence to support the defense.

The jury convicted Combs of the drug conspiracy and possession of a firearm in furtherance of a drug-trafficking offense, but acquitted him of witness tampering. The court sentenced Combs to 126 months for the drug trafficking conviction and 60 months consecutive for the firearms conviction, for a total term of 186 months' imprisonment.

II.

Combs argues first that the district court erred in denying his motion to dismiss the indictment due to outrageous government conduct. This affirmative defense is sometimes raised together with the defense of entrapment, but the two are distinct: "Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions." *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999).

Like the Supreme Court in *United States v. Russell*, 411 U.S. 423, 431-32 (1973), our cases have left open the possibility that, in rare instances, the investigative methods employed by law enforcement could be "so outrageous that due process bars the government from invoking the judicial process to obtain a conviction." *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003). If applicable,

this defense would be "reserved for conduct that falls within the narrow band of the most intolerable government conduct," *id.* (internal quotation omitted), namely, actions "violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause." *Russell*, 411 U.S. at 432 (internal quotation omitted); *cf. Hampton v. United States*, 425 U.S. 484, 492-96 (1976) (Powell, J., concurring); *id.* at 496-97 (Brennan, J., dissenting).

We are aware of only two reported court of appeals decisions—both from the 1970s—that have deemed the government's conduct so outrageous as to violate due process. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the Drug Enforcement Agency asked an informant to approach the defendant about building a methamphetamine laboratory. *Id.* at 375. The defendant agreed to help run the laboratory, and the government provided the informant with everything needed for the laboratory, including difficult-to-obtain chemicals and land on which to build the laboratory. *Id.* at 380. The defendant incurred no cost in building the laboratory, was subordinate in all ways to the informant, and did not even know how to manufacture methamphetamine. *Id.* at 380-81. On these facts, the Third Circuit concluded that "the governmental involvement . . . reached a demonstrable level of outrageousness." *Id.* at 380 (quotation marks omitted). The Ninth Circuit found a due process violation in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), where an undercover agent encouraged the defendants to resume a discontinued bootlegging operation, provided necessary materials, threatened the defendants to accelerate production, and served as the defendants' sole customer. *Id.* at 786-87. The court overturned the conviction, holding that the government may not "involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787.

Assuming for the sake of analysis that government conduct like that exhibited in *Twigg* and *Greene* could establish a due process violation, the ATF's investigation in this case did not transgress the bounds of constitutionally permissible investigative

methods. It is well accepted that "artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932); *see Jacobson v. United States*, 503 U.S. 540, 548 (1992). A sting operation involving a fake stash-house robbery is a common investigative tool designed to prevent actual stash-house robberies—"largely unreported crimes that pose a great risk of violence in residential communities." *United States v. Black*, 733 F.3d 294, 309 (8th Cir. 2013); *see United States v. Warren*, 788 F.3d 805, 808 (8th Cir. 2015) (describing ATF's "Operation Gideon"). Infiltration of a criminal enterprise is a "recognized and permissible means of investigation" that often requires the government agent to employ subterfuge, to participate in the planning of a crime, and even to provide resources for the crime. *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998).

The governmental conduct here fell within this permissible law enforcement tradition. Law enforcement targeted Combs in this sting operation because he was part of what Edmond described as an established home-invasion robbery crew. Conduct by investigators to present a realistic stash-house robbery scenario, to establish rapport with Combs, or to facilitate commission of an offense by a preexisting robbery crew do not shock a universal sense of justice. We thus conclude that the prosecution did not violate Combs's rights under the Due Process Clause.

III.

Combs also contends that the district court erred by denying his request for an entrapment instruction. To successfully raise a defense of entrapment, the defendant must first produce sufficient evidence that the government induced him to commit the offense. The burden then shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *United States v. Kendrick*, 423 F.3d 803, 807 (8th Cir. 2005). Combs proposed an instruction that would have required the jury to acquit if it found that Combs was not predisposed to

commit the crime of conspiracy to possession with intent to distribute five kilograms or more of cocaine and the charged firearms offense, and that the government induced Combs to commit the offenses.

A defendant is entitled to an entrapment instruction only if there is sufficient evidence from which a reasonable jury could find that the defendant was entrapped. *United States v. Cooke*, 675 F.3d 1153, 1156 (8th Cir. 2012). Where the government simply offers a defendant an opportunity to commit a crime, and the defendant promptly avails himself of the criminal opportunity, the defendant is not entitled to an instruction on entrapment. *See Jacobson*, 503 U.S. at 548-50; *United States v. Johnson*, 892 F.2d 707, 710 (8th Cir. 1989).

We agree with the district court that there was insufficient evidence to warrant an entrapment instruction. Our cases say that merely providing a favorable opportunity to commit a crime does not amount to government inducement. *Warren*, 788 F.3d at 810; *United States v. Myers*, 575 F.3d 801, 806 (8th Cir. 2009). But even assuming for the sake of analysis that government agents did more and induced Combs to join the drug conspiracy, there was clear evidence of Combs's predisposition to enter the agreement. At his first meeting with Edmond, Combs eagerly accepted the offer to participate and began discussing how best to rob the stash house and distribute the cocaine. "[W]hen a defendant responds immediately and enthusiastically to his first opportunity to commit a crime, without any period of government prodding, his criminal disposition is readily apparent." *Myers*, 575 F.3d at 807-08. Combs described the robbery as "what we've been waiting on," a phrase that fits almost perfectly a traditional definition of predisposition—*i.e.*, "ready and willing without persuasion" and "awaiting any propitious opportunity to commit the offense." *United States v. Riley*, 363 F.2d 955, 959 (2d Cir. 1966). Combs's criminal history of possessing crack cocaine while carrying a firearm and his admission that he sold cocaine is also strong evidence that Combs was predisposed to join a

conspiracy to distribute cocaine. *See United States v. Booker*, 639 F.3d 1115, 1119 (8th Cir. 2011).

Combs also argues that he was a victim of "sentencing entrapment," because his experience distributing small amounts of cocaine does not show that he was predisposed to distribute eight kilograms of cocaine. After *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a drug quantity that increases a defendant's statutory maximum punishment is an element of a drug trafficking offense. *See United States v. Diaz*, 296 F.3d 680, 683 (8th Cir. 2002) (en banc). Combs asserts that he was entrapped into conspiring to distribute five kilograms or more of cocaine, thus triggering the penalty provision of 21 U.S.C. § 841(b)(1)(A)(ii), rather than trafficking only a smaller quantity. *See United States v. Cortes*, 757 F.3d 850, 860-65 (9th Cir. 2013).

That Combs had not previously distributed kilograms of cocaine, however, suggests only a lack of opportunity, not a lack of predisposition. Combs told Edmond he had been "waiting on" an opportunity this profitable to "take us out of the ghetto," and Combs agreed to commit the robbery because he stood to make "an unbelievable amount of money." The opportunity was profitable because of the quantity of cocaine involved. Combs's readiness to participate demonstrated his predisposition to traffic in a larger quantity of drugs when he had the chance. A defendant is not entitled to an entrapment instruction if there is undisputed proof that he exhibited a predisposition to engage in the criminal conduct. The district court thus did not err in declining to instruct the jury on entrapment. *United States v. Berg*, 178 F.3d 976, 980 (8th Cir. 1999); *United States v. Neal*, 990 F.2d 355, 358 (8th Cir. 1993); *Johnson*, 892 F.2d at 710.

\*　　\*　　\*

The judgment of the district court is affirmed.

_____