# United States Court of Appeals
### For the Eighth Circuit
_____

No. 19-2679
_____

United States of America

*Plaintiff - Appellee*

v.

Jason Harriman

*Defendant - Appellant*
_____

Appeal from the United States District Court
for the Northern District of Iowa - Waterloo
_____

Submitted: June 19, 2020
Filed: August 17, 2020
[Published]
_____

Before LOKEN and GRASZ, Circuit Judges, and CLARK,[1] District Judge.
_____

CLARK, District Judge.

[1] The Honorable Stephen R. Clark, United States District Judge for the Eastern District of Missouri, sitting by designation.

Jason Harriman spent separate stints in prison for kidnapping and assaulting his ex-wife, D.H. When he later served time for being a felon in possession of a firearm, Harriman told fellow inmates at two different prisons that he wanted to find someone to kill D.H. After one of the inmates contacted law enforcement, Harriman voluntarily called an undercover agent posing as a hitman, and had numerous communications with him about killing D.H. and her boyfriend. A two-hour, in-person meeting between Harriman and the agent culminated in a written murder-for-hire contract that Harriman sent to the agent. A jury convicted Harriman of two counts of murder-for-hire, in violation of 18 U.S.C. § 1958. The district court[2] sentenced Harriman to 240 months imprisonment and three years supervised release. Harriman appeals, arguing the evidence established his entrapment defense, the district court abused its discretion in denying his motions for new counsel and new trial, and ineffective assistance of counsel. We affirm.

## I.    Background

In 1995, when he was 21 years old and she was 16 years old, Harriman met D.H. and began a romantic relationship with her. By the end of the year, they were living together. They had a tumultuous relationship; Harriman was jealous and controlling and began physically abusing D.H. In the summer of 1996, D.H. moved back in with her mother. Harriman then came to the house and kidnapped D.H. at knifepoint. He repeatedly hit her, yelled at her, and cursed her. At one point, Harriman again held the knife to her throat and said he was going to contact a friend to hurt her. Eventually they ended up at a hotel, where law enforcement arrested Harriman.

Harriman pleaded guilty to kidnapping and burglary, and the state court sentenced him to prison. While in prison, Harriman and D.H. began talking again and they married in June 2000. After Harriman was released, they began living

---

[2] The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

together again and Harriman resumed his physical abuse of D.H. In 2007, Harriman put his hands around D.H.'s neck and choked her, leaving bruises. He was convicted of simple domestic assault. After this incident, although they continued to have sex on occasion, Harriman and D.H. never fully resumed their relationship, and they divorced in 2009. They have two children together.

In 2011, Harriman was convicted in federal court of two counts of being a felon in possession of a firearm. The court sentenced him to a term of imprisonment, and he began serving his sentence in the federal prison in Terre Haute, Indiana. While there, Harriman often complained to a fellow inmate about D.H. On multiple occasions, Harriman told this inmate that he wanted to find someone to kill D.H. and her then-boyfriend. In one conversation, he referred to his children as "collateral damage."

Harriman and D.H. did not communicate for several years, until 2015 when a court ordered D.H. to allow Harriman to have visitation and phone calls with his children. At some point, the Bureau of Prisons transferred Harriman to the federal prison in Forrest City, Arkansas, and in 2017, while at Forrest City, Harriman and D.H. began to communicate more frequently. They spoke regularly over the phone and corresponded through email. Harriman often talked about getting back together, but in January 2018, D.H. began dating someone else. When Harriman found out, he frequently became angry with D.H., yelled at her, called her names, and threatened her. He accused her of putting him in prison. In frequently threatening her, he referred to "the path" she had chosen, and made statements such as, "This is the path you want us to go, well, let's get walking. Hope you enjoy the walk until the trail ends."

In March 2018, in a phone call with his son, Harriman said he wanted "to smash [D.H.] in the f*cking face." On the same call, he told D.H. that when he got out, "I'm going to f*cking kill you, b*tch." On another call, after his son noted that on the last three calls Harriman had threatened to kill D.H., Harriman responded that "it's not a threat." He further stated that, "The only thing I have in my heart now is

revenge" and "I'm gonna act on my revenge." In following phone calls, he continued to tell D.H. and his son that he would beat D.H. and her boyfriend, that she was going to get hurt, and that she was "gonna be done." He once asked her how precious her life was.

Throughout his time at Forrest City, Harriman spoke with William Risinger, a fellow inmate who met Harriman in October 2017. They spoke daily and Harriman often talked about his relationship with D.H. He frequently blamed D.H. for his prison sentence and Risinger would overhear Harriman yelling at D.H. on the phone. After these calls, Harriman would visit Risinger and curse D.H. and talk about hurting her, including disfiguring her to make her unattractive and paralyzing her so she could not have sex with anyone. In mid to late February of 2018, Harriman told Risinger, "I wish I knew somebody who would kill the b*tch." Risinger asked if he really wanted her dead, to which Harriman responded "yes." Harriman asked Risinger if he knew anyone and Risinger said he might and would need to make a call.

Risinger called his son and asked him to contact law enforcement. Special Agent Everett Wayland of the Bureau of Alcohol, Tobacco, Firearms and Explosives provided Risinger's son with a phone number to give to Harriman. The phone number belonged to Special Agent Wesley Williamson, an undercover agent with the ATF who posed as a hitman named William Johnson. Harriman first called Agent Williamson on February 28, 2018. From then until May 2018, Harriman called Williamson 13 times and exchanged many emails. In these calls and emails, they spoke in coded language, discussing "business" and "properties" when speaking of the murder of D.H. and her boyfriend, whom Harriman also wanted killed. In one email, Harriman sent Agent Williamson the address he had for D.H., a trailer park in Oelwein, Iowa, and told Agent Williamson that D.H. worked at the Dairy Queen in Oelwein. In another email, with the subject line "property," Harriman stated, "The one I know we will need to completely demolish, but the other we should be able to just hopefully do a little facial remodeling. Let it be known it's under ownership . . ."

In late March 2018, Agent Williamson traveled to Oelwein, Iowa, and emailed Harriman to let him know. While in Iowa, Agent Williamson spoke with Harriman on the phone, and told Harriman he had found one spot pretty easy, meaning he had found D.H., but had not found the other spot with which he was less familiar, meaning he had not seen D.H.'s boyfriend. Harriman told Agent Williamson he could follow one spot to the other, meaning he could follow D.H. to find her boyfriend. The next day, Agent Williamson returned to Oelwein and saw D.H. in town. He also went to the address Harriman provided and saw a red minivan that Harriman said belonged to D.H. As he was leaving Oelwein, Agent Williamson spoke to Harriman and told him he had seen one but not the other, meaning he had seen D.H. but not her boyfriend.

During one of their conversations, Agent Williamson asked Harriman if he owned any cars, to which Harriman responded he had three cars stored at a friend's house including a 1969 Dodge Charger. Agent Williamson requested the Charger as a down payment, and Harriman agreed. Harriman then contacted his friend in Traer, Iowa, who was storing the car, and told him that two men would be coming to pick up the car. Harriman told his friend that he was using the car as a down payment on a body shop. In mid-April, ATF agents traveled to Traer and picked up the Charger. Agent Williamson spoke with Harriman about the pickup and Harriman called his friend to verify that the car had been picked up.

Through phone and email, Harriman and Agent Williamson made arrangements for Agent Williamson to visit Harriman in prison. Harriman obtained a visiting form and mailed it to Agent Williamson who filled it out and returned it. Harriman instructed Agent Williamson to put on the form that he had known Harriman for at least five years before incarceration. Agent Williamson did so, putting on the form that he had known Harriman for 20 years. At the beginning of April, Harriman let Agent Williamson know he could visit Harriman. Agent Williamson told Harriman the visit would be to confirm what Harriman wanted and that he would take $25,000 as a down payment, and another $25,000 when the person was killed. In another call, Harriman said he would like to grab both properties

(meaning D.H. and her boyfriend), and if they could get both at the same time, it might result in a deal.

On April 21, 2018, Agent Williamson visited Harriman in prison. The visit in the prison visitation room was recorded by video and audio, and lasted nearly two hours. After some small talk, Agent Williamson asked Harriman, "What do you want me to do, man?" Harriman responded, "What you do, you know what I mean?" During the conversation, Harriman referred to "property 1" to which Agent Williamson replied that "property 1" was D.H. When Agent Williamson then referred to "property 2" as the boyfriend, Harriman said he did not know what he was talking about. Agent Williamson told Harriman, "I ain't here to start no business. I mean, if you think I'm here to start a business, I ain't here to start a business." He also said, "If there's a misunderstanding, there's a misunderstanding and I'll go on my way and you'll go on your way and we'll bid each other farewell, but that's not what I understood I was supposed to be doing." Agent Williamson also told Harriman that when he finished a job, a person's heart did not beat any more and he did not do anything else.

Multiple times throughout the visit, Agent Williamson told Harriman that Harriman could walk away and that if he did so, Agent Williamson would "eat [his] expenses[.]" Harriman expressed concerns about looking guilty. Agent Williamson again reiterated, more than once, that Harriman could say no. He made statements such as "Dude, just say no," "Just say no, bro, and I'm out of here," and "You've got to decide. I mean, like I said, no is an easy no." When Harriman asked if Agent Williamson was wearing a wire, Agent Williamson lifted his pant leg and pulled down his shirt to show he was not. As the visit continued, Harriman said, "My main thing is I don't want anything coming back at me," and "With her, I want to do it."

Agent Williamson told Harriman that if he wanted to do it, it would be $25,000 if D.H. and her boyfriend were together. Agent Williamson said he would credit Harriman $5,000 for the Charger. If Agent Williamson murdered them separately, he said it would cost $50,000, but he would give Harriman a break and

-6-

do the two murders separately for a total of $40,000. Agent Williamson told Harriman he would give Harriman five years after prison to pay it off. Harriman nodded his head in response and Agent Williamson confirmed, "Property 1 and Property 2? You want them both?" Agent Williamson then told Harriman he would send him a contract for $25,000 together or $45,000 separate[3] and that if Harriman did not want to do it, then he should not sign the contract and should not send it back. Agent Williamson again stated, "It's up to you, bro. I mean, if you don't want to take the risk, don't take the risk. Just say no."

Agent Williamson told Harriman if he did them together, he would make it look like an accident and that she would "suffer." He said minivans were easy to burn. Harriman asked how it would work if he did "the minivan thing" and stated that he wanted D.H. to know why it was being done. Agent Williamson said, "Tell me exactly what you want me to tell her . . . What is something that – if I told her something that she would only know it came from you?" Harriman asked Agent Williamson to tell D.H., "This is the path you wanted." Harriman asked if the written contract was necessary, and Agent Williamson replied that the contract told him Harriman was serious. Harriman again asked if Agent Williamson was a cop, which Agent Williamson again denied. Harriman then said, "You keep wanting me to say it and confirm sh*t out loud. Why can't I just shake my head and then you know it's good?" Harriman then nodded. The conversation continued with Agent Williamson further discussing that he understood Harriman to want the murder of both D.H. and her boyfriend, and Harriman continuing to nod his head in agreement. The visit concluded shortly thereafter.

After speaking with Harriman twice more, Agent Williamson sent him two contracts. One listed a price of $21,000 and stated it was for the purchase and complete demolition of Property 1 and 2, if completed together. The second listed

---

[3] The record contains no direct explanation of the discrepancy between the $40,000 and $45,000 prices and is unclear on whether Agent Williamson would credit $5,000 for the Charger from the $45,000 price to get to the $40,000 he stated.

a price of $41,000[4] and stated that it was for the purchase and complete demolition of Property 1 and 2, if completed separate and independent of each other. In mid-May 2018, Harriman called Agent Williamson and told him he had mailed the contract back.

Harriman also asked if Agent Williamson could record the murders so that when he got out of prison, he could see the "before and after." Agent Williamson said that was "pretty f*cked up" and laughed. Harriman laughed and said, "yeah." Williamson then said he would make sure the path was known.

Meanwhile, Risinger contacted the ATF and reported Harriman was going to have someone else sign the contract because it made him nervous to sign it himself. Harriman told Risinger he chose the option in the contract to have them both killed. Risinger also told the ATF that Harriman said he was going to write a seemingly exculpatory note on a separate piece of paper on top of the contract to create indentations on the contract, but he would not actually send the note. Then, if necessary, Harriman said he could claim law enforcement got rid of the note. Harriman also told Risinger that when he spoke with Agent Williamson, he referred to D.H. and her boyfriend as Property 1 and Property 2, and referred to what he wanted done as "demolished" and "remodeled." Harriman told Risinger how the killings would occur and that Agent Williamson wanted it to look like an accident, possibly through a car wreck and a fire. All that mattered to Harriman was that D.H. knew for sure that this was his doing and he told Risinger that he wanted Agent Williamson to say "this is the path you chose" as he killed her.

On May 22, 2018, Agent Williamson received one of the contracts back from Harriman, the $21,000 contract. The name "Jason Harriman" was both signed and printed on the second page, and no handwritten note was included with the contract. The ATF sent the signed contract for forensic testing. A forensic document analyst

_____

[4] The record also contains no explanation of the discrepancy between the figures in the written contracts and the figures discussed during Agent Williamson's in-prison visit with Harriman.

could not conclude whether the signature was Harriman's, but did find indented writing on the first page of the contract. The indented writing said Harriman just wanted to scare D.H. through a phone call or two, and not go as far as the contracts stated. A fingerprint specialist identified fingerprints on the contract matching Harriman's and those of another Forrest City inmate.

On May 25, 2018, Harriman called Agent Williamson to ask if he had received the "package." Agent Williamson asked if there had been any change on Harriman's end and Harriman said no and reiterated his request for a recording or pictures. About a week later, Agent Wayland conducted a ruse interview with Harriman and told him that D.H. had been killed. Harriman was interested in the details.

In July 2018, a grand jury returned an indictment charging Harriman with two counts of murder-for-hire under 18 U.S.C. § 1958. Before trial, Harriman filed two motions for new counsel. At the hearing on his first motion,[5] held in October 2018, after allowing Harriman to air his grievances, the magistrate judge denied his motion for new counsel. The magistrate judge concluded that Harriman's complaints about his attorney did not relate to the case at issue, that his attorney was doing a good job, and his attorney and he continued to communicate. The magistrate judge explained to Harriman that while there were certain decisions Harriman gets to make, such as whether to plead guilty and whether to testify at trial, other decisions, i.e. what defenses to pursue, what motions to file, how to examine witnesses, his attorney gets to decide.

At the hearing on his second motion for new counsel,[6] held the week before trial, the district judge denied Harriman's second motion for new counsel, finding that Harriman's attorney had done a substantial amount of work, had witnesses lined

---

[5] The Honorable Mark A. Roberts, Magistrate Judge for the Northern District of Iowa presided at this hearing.

[6] The Honorable C.J. Williams, District Judge for the Northern District of Iowa, presided at this hearing.

up for trial, and knew the case. The district judge again explained to Harriman that he had a right to make the decision whether to plead guilty or go to trial, but all other decisions were to be made by his attorney, who has experience, training, and education in the law. The district judge stated that even if Harriman disagreed with his attorney on these decisions, "at the end of the day . . . it is [the] attorney's call to make on those instances . . . He needs to work with you, listen to you, hear you out. And then he makes the decision."

On January 22, 2019, trial began. At the close of the prosecution's case-in-chief, Harriman moved for an entrapment instruction on both counts. The district court granted the motion and gave the instruction. Harriman chose to testify at trial. He denied asking a fellow inmate, while incarcerated in Terre Haute, Indiana, to find someone to kill D.H. He testified that he talked with Risinger about opening a body shop in Oelwein once they got out of prison and that he believed Risinger wanted to launder money through the body shop. He also stated that he raised the idea of opening a kids' recreation center in Oelwein. Harriman testified that he believed the phone number Risinger gave him belonged to a person who would find real estate properties for him and would call D.H. to scare her into bringing the kids to see him. He claimed he did not know Agent Williamson was a hitman until he came to visit him in Forrest City and that he believed Agent Williamson and Risinger were connected to drug cartels. Harriman testified that he believed the cartel wanted to help him open a kids' recreation center and dance hall in Oelwein, Iowa, because the cartel wanted to launder money through the dance hall and Harriman's body shop.

The jury convicted Harriman on both counts of murder-for-hire, rejecting his entrapment defense. After the verdict, Harriman, through his counsel and via *pro se* motions, moved for a new trial, which the district court denied. At his sentencing hearing, the district court imposed an enhancement for obstruction of justice, finding Harriman lied in his testimony at trial. The district court did not believe Harriman's "unbelievable story" and found Harriman's testimony "patently incredible" and "patently false[.]" The district court sentenced him to 240 months imprisonment, and three years of supervised release. Harriman filed a timely notice of appeal.

## II. Analysis

## A. Entrapment

We review *de novo* an appeal based on insufficiency of the evidence. *United States v. Strubberg*, 929 F.3d 969, 974 (8th Cir. 2019). "The jury's verdict will be upheld if there is any interpretation of the evidence that could lead a reasonable jury to find the defendant guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Young*, 613 F.3d 735, 742 (8th Cir. 2010)). We resolve conflicts in favor of the prosecution, view the evidence in the light most favorable to the prosecution, accept all reasonable inferences that support the verdict, and do not pass on the credibility of witnesses or the weight to be given their testimony. *United States v. Warren*, 788 F.3d 805, 810 (8th Cir. 2015); *United States v. Moua*, 895 F.3d 556, 559 (8th Cir. 2018).

Entrapment is an affirmative defense. *United States v. Ardrey*, 739 F.3d 1189, 1191 (8th Cir. 2014). To successfully raise a defense of entrapment, Harriman must first produce sufficient evidence that the government, here the ATF, induced him to commit the offense. *United States v. Combs*, 827 F.3d 790, 796 (8th Cir. 2016). The prosecution then must prove beyond a reasonable doubt that Harriman was predisposed to commit the crime. *Id.* Thus, "a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Ardrey*, 739 F.3d at 1191 (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).

"Inducement occurs when the government creates a substantial risk that an otherwise law abiding person will commit a criminal offense." *Warren*, 788 F.3d at 810. Inducement may include "pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship." *United States v. Clarett*, 907 F.3d 1100, 1102 (8th Cir. 2018). It requires more than a favorable opportunity to commit a crime. *Warren*, 788 F.3d at 810. "And it is

well settled that the government may use artifice, stratagem, and undercover agents in its pursuit of criminals." *United States v. Myers*, 575 F.3d 801, 806 (8th Cir. 2009) (citing *Jacobson v. United States*, 503, 548 (1992)).

At trial, Harriman did not produce sufficient evidence that the ATF induced him to commit murder-for-hire. Harriman made initial contact with Agent Williamson by choosing to call the number Risinger provided him. Harriman then proceeded to call Agent Williamson 13 times, initiating each call. Harriman also made arrangements for Agent Williamson to visit him. He sent Agent Williamson the visitor form and told him how to fill it out to be approved, which included lying about how long Agent Williamson had known Harriman. During the in-person meeting, Agent Williamson repeatedly told Harriman he could walk away, he could just say no, and that Agent Williamson would "eat [his] expenses." At the end of the conversation, Agent Williamson told Harriman if he did not want to go forward, then he should not send the contract back to Agent Williamson.

Throughout the meeting, Agent Williamson pushed Harriman to clarify what exactly he wanted, but he did not pressure Harriman into choosing to have D.H. and her boyfriend murdered. Agent Williamson provided no assurances that Harriman was not doing anything wrong, did not persuade him into a certain course of action, did not threaten or harass Harriman, and did not make any pleas based on need, sympathy, or friendship. Harriman did not establish at trial that the ATF induced him to hire a hitman to murder D.H. and her boyfriend. We uphold the jury's verdict rejecting Harriman's entrapment defense.

Moreover, a reasonable jury could find that the prosecution proved Harriman was predisposed to commit this crime. *Combs*, 827 F.3d at 796. Predisposition "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal, who readily availed himself of the opportunity to perpetrate the crime." *Myers*, 575 F.3d at 805 (quoting *Mathews*, 485 U.S. at 63) (internal quotations omitted). "It is only when the Government's deception actually implants the

criminal design in the mind of the defendant that the defense of entrapment comes into play." *United States v. Russell*, 411 U.S. 423, 436 (1973).

The evidence at trial established that Harriman previously sought to hire someone to murder D.H. through a fellow inmate, William Risinger, and stated his children were just "collateral damage." He then contacted the purported hit man provided by the fellow inmate, Agent Williamson. *See Meyers*, 575 F.3d at 806 ("[W]hen a defendant responds immediately and enthusiastically to his first opportunity to commit a crime, without any period of government prodding, his criminal disposition is readily apparent."). Considering this evidence in the light most favorable to the prosecution, a reasonable jury could conclude that Harriman was predisposed to commit murder-for-hire. We uphold the jury's verdict.

## B. Motion for New Trial

We review "the denial of a motion for new trial for an abuse of discretion." *United States v. Petroske*, 928 F.3d 767, 774 (8th Cir. 2019) (quoting *United States v. Morris*, 817 F.3d 1116, 1121 (8th Cir. 2016)). "Motions for new trial are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred." *Id*.

Harriman's motion for new trial focused on his entrapment defense. On appeal, Harriman argues, in denying his motion for new trial, that the district court focused primarily on evidence supporting the verdict, and found nothing improper in Agent Williamson's conduct in direct contrast to the district court's comments when discussing whether to give the entrapment instruction. Harriman asserts the district court erred in focusing on the evidence favoring the prosecution rather than weighing the evidence for itself. Harriman also filed his own *pro se* motions for new trial, which the district court also denied.

Federal Rule of Criminal Procedure 33(a) provides that, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the

interest of justice so requires." Rule 33 motions are "disfavored" and a district court "must exercise [] Rule 33 authority sparingly and with caution." *United States v. Anwar*, 880 F.3d 958, 970 (8th Cir. 2018) (quoting *United States v. Rubashkin*, 655 F.3d 849, 857 (8th Cir. 2011), *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002)). A district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict" "if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." *Id*. (quoting *United States v. McClellon*, 578 F.3d 846, 857 (8th Cir. 2009)).

Here, the district court reviewed the evidence and found that more than sufficient evidence existed for a jury to convict Harriman and reject his entrapment defense. The district court did not, as Harriman argues, assess the evidence in the light most favorable to the verdict. It specifically stated, "The Court's own weighing of the evidence leads the Court to conclude that defendant fully intended to hire someone to kill D.H. and A.W., that he is a violent and jealous man who sought to avenge the wrongs and betrayal he believed he suffered at D.H.'s hands."

The evidence supports the district court's conclusion. Harriman was a violent, abusive partner throughout the entirety of his relationship with D.H. He had convictions for kidnapping and domestic abuse against D.H. and he had previously inquired into hiring someone to kill her. The phone calls between Harriman and his son or D.H. are filled with vitriol towards D.H. Once at Forrest City, he again inquired into hiring a hitman to kill D.H. and her boyfriend. After being provided a phone number, he contacted someone he believed was a hitman. He repeatedly emailed and called the hitman and eventually arranged for him to visit Harriman in prison to finalize the deal. He signed, or had someone else sign for him, a contract to carry out the murders. Finally, he asked for the hitman to record the murders for him, which he admitted was "pretty f*cked up." The district court did not abuse its discretion in denying Harriman's motions for new trial.

-14-

The district court's decision to instruct the jury on Harriman's entrapment defense does not contradict its later conclusion that the agent did not induce Harriman to commit the crime. The district court found there was arguably enough evidence from which a reasonable jury could find entrapment and that there was enough evidence that the agent's actions had "the appearance of dogged insistence" for the district court to grant an instruction. However, the district court clarified, "It's a fairly low hurdle that the defendant has to present, so to be clear, I'm not finding that the defendant was entrapped." Nothing in the district court's findings on Harriman's motion for new trial contradicts these statements.

Finally, Harriman argues that the district court erred in denying his *pro se* motions for new trial and should have at least held a hearing on the motions. In his motions, Harriman argues that the district court should have granted his motions for new counsel and that prosecutorial misconduct occurred, and asserts that the evidence weighs in his favor. Harriman also includes a litany of complaints about his attorney. Any motion for new trial for a reason other than newly-discovered evidence must be filed within 14 days after a verdict. Fed. R. Crim. P. 33(b)(2). Harriman filed his first motion 55 days after the verdict and he filed his second motion 156 days after the verdict. Neither motion was timely, and the district court properly denied the motions.

### C. Motions for New Counsel

We review the denial of a request for new counsel for abuse of discretion. *United States v. Pendleton*, 832 F.3d 934, 942 (8th Cir. 2016). To obtain new counsel, a defendant must show "justifiable dissatisfaction with his appointed counsel that arises from difficulties such as 'irreconcilable conflict, a complete breakdown in communication, or any other factor interfering significantly with an attorney's ability to provide zealous representation.'" *Id*. (quoting *United States v. Boone*, 437 F.3d 829, 839 (8th Cir. 2006)). A defendant does not establish justifiable dissatisfaction by showing frustration with his counsel or disagreements with his tactical decisions. *Id*.

At the hearing on Harriman's first motion for new counsel, Harriman complained that his counsel did not get the contact information of his friends and family members from a database at the Forrest City prison, did not quickly get Harriman's files for a separate habeas corpus lawsuit and an unrelated civil lawsuit, and that Harriman did not feel comfortable with the public defender's office based on conduct in a previous case. In relation to this case, he claimed that he had to tell his attorney to assert an entrapment defense, that his attorney tried to get him a plea deal despite Harriman's wanting to go to trial, and that his attorney generally did not have his best interests at heart.

Most of Harriman's complaints do not relate to anything in the adversarial process in this case. "The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney." *United States v. Buck*, 661 F.3d 364, 372 (8th Cir. 2011) (quoting *United States v. Barrow*, 287 F.3d 733, 738 (2002)). The district court appointed Harriman's attorney to represent him in this case, not to provide general legal counsel in all of Harriman's affairs. Further, Harriman failed to establish an irreconcilable conflict or a complete breakdown in communication. His counsel listened when Harriman asked about an entrapment defense and filed notice of Harriman's intent to seek such a defense. His counsel also prepared for trial even while seeking a plea deal for Harriman, not an unreasonable tactical course, particularly considering the weight of the evidence against Harriman.

At the hearing, the magistrate judge conducted an adequate inquiry into the nature and extent of Harriman's complaints. *Buck*, 661 F.3d at 372 ("Given the importance of the attorney-client relationship, the court must conduct an adequate inquiry into the nature and extent of an alleged breakdown in attorney-client communications."). The magistrate judge found that Harriman's counsel was a compassionate, experienced attorney working diligently to represent Harriman. He found that Harriman and his counsel could communicate and continue to work together on Harriman's defense. The magistrate judge did not abuse its discretion in denying Harriman's first motion for new trial.

-16-

In his second motion, filed the week before trial, Harriman asserted that his counsel had not talked to numerous witnesses that Harriman suggested for his defense, and that his counsel had taken several other actions that had hurt his case. Harriman's complaints concern frustration with his counsel and disagreement with his tactical decisions, which do not amount to justifiable dissatisfaction entitling him to new counsel. *Boone*, 437 F.3d at 839. At the hearing on the motion, the district judge read Harriman's motion into the record, and gave Harriman a chance to add anything else he wished. The district judge also stated that he read the transcript from the hearing on Harriman's first motion for new counsel. The district judge then patiently explained to Harriman why it was denying his motion, which included an explanation of which decisions were Harriman's to make versus the decisions that were his counsel's to make. The district judge conducted an adequate inquiry into the nature and extent of Harriman's complaints. The district judge did not abuse his discretion in denying Harriman's second motion for new counsel. *Buck*, 661 F.3d at 372.

### D.    Ineffectiveness of Counsel

We review claims of ineffective assistance of counsel on direct appeal only in exceptional cases. *United States v. Johnson*, 827 F.3d 740, 746 (8th Cir. 2016). A case is exceptional if, "after the relevant factual record has been fully developed, a failure to examine the claim on direct appeal would be a 'plain miscarriage of justice,' or trial counsel's alleged error is 'readily apparent' to this Court." *Id.* (quoting *United States v. Sanchez-Gonzalez*, 643 F.3d 626, 628-29 (8th Cir. 2011)). Harriman's allegations that his counsel did not thoroughly investigate the facts and issues and did not present exculpatory evidence do not rise to the level of an exceptional case. Additionally, analysis of Harriman's ineffective assistance claim requires further development of the factual record because the record does not show why his counsel made the choices he did, particularly with the presentation of certain evidence. Declining to consider this claim on appeal does not constitute a

miscarriage of justice because Harriman can still timely pursue his claim under 28 U.S.C. § 2255. *Sanchez-Gonzalez*, 643 F.3d at 629.

## III.   Conclusion

For the above reasons, we affirm the district court's judgment.

———————————————————