# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-1713
_____

United States of America

*Plaintiff - Appellee*

v.

Travis Broeker

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 17, 2021
Filed: March 7, 2022

_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Appellant Travis Broeker was indicted for distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and conspiracy to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. Broeker was convicted on both counts following a jury trial, and the district court[1] sentenced him

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

to 276 months imprisonment. Broeker now appeals. Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I.

On February 28, 2018, Joseph Fedke found his roommate, T.Z., unconscious. After Fedke called 911, paramedics administered Narcan, a medication used to reverse an opiate overdose, and transported T.Z. to the hospital. When questioned, T.Z. indicated that he had snorted fentanyl. While T.Z. was at the hospital, Fedke searched T.Z.'s bedroom and found T.Z.'s cell phone and three half-clear, half-black capsules containing white powder, as well as five white pills.[2] To prevent T.Z. from accessing his cell phone, the capsules, or the white pills, Fedke removed them from T.Z.'s bedroom. T.Z. returned home late that evening, and Fedke and T.Z. were together until approximately 2:30 a.m. The following morning, on March 1, Fedke again found T.Z. unresponsive. Fedke called 911, but this time, responding paramedics were unable to revive T.Z, and he was later pronounced dead.

Following T.Z.'s death, Detective Joe Percich with the St. Louis County Police Department searched T.Z.'s bedroom. At trial, Detective Percich testified that on T.Z.'s nightstand, he found a round rubber ball which had been cut open, hollowed out, and filled with white powder. This rubber ball was accompanied by a straw that had been cut, and at one end of the straw, Detective Percich observed white residue or powder in the straw's interior. Additionally, Detective Percich searched a backpack located in T.Z.'s bedroom and found inside seven purple capsules containing an unknown powder and ten clear capsules containing a brown or tan unknown powder. Following the search of T.Z.'s bedroom, Detective Percich

---

[2]On direct examination, the government asked Fedke if he recalled finding the white pills in T.Z.'s bedroom, and Fedke responded, "I believe so. I don't recall that much right now." Throughout his examination, Fedke maintained that he could not remember if he removed white pills from T.Z.'s bedroom. However, two officers, discussed infra, testified that when they arrived on the scene on the morning of March 1, Fedke gave them the white pills.

interviewed Fedke, and at that time, Fedke gave Detective Percich the items that he had removed from T.Z.'s bedroom (i.e., T.Z.'s cell phone, as well as the half-clear, half-black capsules and the white pills). Detective Marcial Amaro with the St. Louis County Police Department also testified that after arriving onto the scene, Fedke relinquished three "black and white" capsules and five pills which were "white and oval shape."

Christina Rauhauser, a forensic chemist for the St. Louis County Crime Lab, testified that the half-clear, half-black capsules removed by Fedke and then given to Detective Percich tested positive for the presence of fentanyl, as did the rubber ball and the white powder found inside the rubber ball. She further testified that the five white pills removed by Fedke disclosed the presence of lorazepam. Rauhauser then testified that the seven purple capsules containing an unknown powder and the ten clear capsules containing a brown or tan unknown powder were tested and did not contain a controlled substance. Rauhauser did not test the substance found on the straw. Fedke also testified that the seven purple capsules containing an unknown powder and the ten clear capsules containing a brown or tan unknown powder were his weight loss supplements, and, knowing what they were, he had not removed them from T.Z.'s room. Further, Detective Percich testified that no electronic devices were recovered from T.Z.'s bedroom, and Fedke testified that T.Z. did not have access to a vehicle between the time he returned from the hospital and the time he was pronounced dead.

After T.Z.'s father provided the personal identification number (PIN) code to T.Z.'s phone, Detective Josiah Merritt with the St. Louis County Police Department searched that phone and found text messages that T.Z. had exchanged with a number ending in 0523. T.Z. had labeled this 0523 number with the contact name "Travis Perkey." The 0523 number was registered to a Pamela Barton. Using T.Z.'s phone and posing as T.Z., Detective Merritt arranged to purchase fentanyl from "Travis Perkey." Another officer, with the assistance of Detective Merritt, used a second, disposable phone and phone number to pose as a friend of T.Z. named "Carl." Using this second phone, the officers arranged a second fentanyl purchase from "Travis

Perkey." Because T.Z. would not actually be available to meet "Travis Perkey" to purchase fentanyl from him, Detective Merritt used T.Z.'s phone and told "Travis Perkey" that he would send his money for the fentanyl with "Carl."

On March 2, an undercover officer posing as "Carl" arrived at the designated meeting place to purchase fentanyl for himself and T.Z. However, Pamela Barton, not "Travis Perkey," arrived. The undercover officer purchased a brown pill bottle containing approximately 20 half-clear, half-black capsules containing white powder from Barton before arresting her. A search of her vehicle revealed additional half-clear, half-black capsules containing white powder in her driver's side door. After "Carl" falsely told "Travis Perkey" that Barton had not arrived at the designated meeting place, "Travis Perkey" arranged to meet with the undercover officer to consummate the fentanyl transaction. Broeker arrived, and upon his arrival, officers arrested him. Broeker had in his possession the phone associated with the 0523 number. Text messages on this phone showed that the last text message exchanged between Broeker and T.Z. on February 28 was at 7:05 p.m., approximately 22 minutes before Fedke called 911 to report T.Z.'s overdose. Additionally, Detectives Percich and Merritt interviewed Broeker, who waived his Miranda[3] rights before admitting to selling fentanyl to T.Z. on the evening of February 28, identifying Pamela Barton as his girlfriend, and admitting to sending Barton to sell fentanyl to the undercover officer.

At trial, Rauhauser testified that she tested both the capsules contained in the brown pill bottle and the capsules found in the door of Barton's vehicle. The tests revealed the presence of heroin and fentanyl in the capsules contained in the brown pill bottle and the presence of fentanyl in the capsules found in the vehicle's door. Dr. Gershom Norfleet, the Assistant Medical Examiner at the St. Louis County Medical Examiner's Officer, testified that following T.Z.'s death, he reviewed T.Z.'s medical records, conducted an examination of T.Z.'s clothing, and conducted an external examination of T.Z.'s body. He also collected samples of blood, urine, and

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

vitreous fluid from T.Z.'s body, which he then submitted to Dr. Sarah Riley, the director of the St. Louis University Forensic Toxicology Laboratory. Dr. Riley testified that she tested these samples and found the presence of fentanyl and its metabolite, norfentanyl; bupropion, an anti-depressant; lorazepam, a benzodiazepine (another anti-depressant or sedative); gabapentin, which is used for neuropathic pain; diphenhydramine (Benadryl); and Delta-9 tetrahydrocannabinol (THC), the active ingredient in cannabis, as well as the breakdown products of THC or marijuana. Dr. Riley testified that without knowing the other circumstances of T.Z.'s death, the amount of fentanyl discovered in T.Z.'s body could have, by itself, caused his death. After conducting his own postmortem examination and reviewing the toxicology report from Dr. Riley, Dr. Norfleet testified that at the time of his death, T.Z. had multiple drugs in his system, including fentanyl, a benzodiazepine, gabapentin, and THC. Further, Dr. Norfleet opined that the level of fentanyl present in T.Z.'s blood was "incompatible or inconsistent with life" and that fentanyl intoxication caused T.Z.'s death.

After the government rested, Broeker moved for acquittal, but the district court denied his motion. Broeker then testified, and following closing arguments, the jury convicted Broeker on both counts. Broeker renewed his motion for acquittal and moved, in the alternative, for a new trial. The district court denied both of these motions.

II.

Broeker appeals the district court's denial of his motions for acquittal and a new trial. Because his arguments in support of both motions are almost identical, we address the motions contemporaneously. First, Federal Rule of Criminal Procedure 29(a) requires a district court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." When reviewing a district court's denial of a motion for acquittal, "[w]e apply the same standard of review to the district court's ruling on a motion for judgment of acquittal as we do to a sufficiency of the evidence challenge." United States v. Aungie, 4

-5-

F.4th 638, 643 (8th Cir. 2021) (citation omitted). Reviewing this denial de novo, we "view[] the entire record in the light most favorable to the government, resolv[ing] all evidentiary conflicts accordingly, and accept[ing] all reasonable inferences supporting the jury's verdict." Id. (citation omitted). We will reverse a district court's denial of a motion for acquittal "only 'if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt.'" See United States v. Gonzalez, 826 F.3d 1122, 1126 (8th Cir. 2016) (citation omitted); see also United States v. Hassan, 844 F.3d 723, 726 (8th Cir. 2016) ("In evaluating a motion for judgment of acquittal, we cannot pass upon the credibility of witnesses or the weight to be given their testimony, as this is uniquely within the province of the trier of fact, and entitled to special deference.").

Alternatively, we review a district court's denial of a motion for a new trial under the stricter, abuse-of-discretion standard. See Manning v. Jones, 875 F.3d 408, 410 (8th Cir. 2017) (explaining the "key question [is] whether a new trial is necessary to prevent a miscarriage of justice"). Federal Rule of Criminal Procedure 33(a) provides that a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." However, "Rule 33 motions are 'disfavored' and a district court 'must exercise [ ] Rule 33 authority sparingly and with caution.'" United States v. Harriman, 970 F.3d 1048, 1058 (8th Cir. 2020) (alteration in original) (citation omitted); see also United States v. Stacks, 821 F.3d 1038, 1045 (8th Cir. 2016) (explaining new trials are "reserved for exceptional cases in which the evidence preponderates heavily against the verdict" (citation omitted)).

To convict a defendant of distribution of a controlled substance—here, fentanyl—resulting in death, the government must prove, beyond a reasonable doubt, that the defendant knowingly or intentionally distributed a controlled substance and that death resulted from the use of that drug. See Burrage v. United States, 571 U.S. 204, 210 (2014); see also 21 U.S.C. § 841(a)(1) (criminalizing the knowing or intentional distribution of a controlled substance); 21 U.S.C. § 841(b)(1)(A)-(C) (imposing increased sentences when "death or serious bodily injury results from the use of [the distributed controlled substance]"). In Burrage,

the Supreme Court explained that Congress, in choosing to use the phrase "results from" in § 841(b)(1), "import[ed] but-for causality." See 571 U.S. at 216. Since then,

> at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury.

Id. at 218-19. Because Broeker admitted to distributing fentanyl to T.Z. immediately prior to T.Z.'s death, the parties only contest whether that fentanyl caused T.Z.'s death.

In his motion for acquittal, Broeker argued that the government presented insufficient evidence of causation. In his view, the government only presented evidence that Broeker sold fentanyl to T.Z. and that the sale occurred in close temporal proximity to T.Z.'s first overdose, and this alone is insufficient to show that the fentanyl he distributed caused T.Z.'s death. See, e.g., R. Doc. 150, at 4 ("None of the witnesses could testify as to whether the drugs causing T.Z.'s death were the same substance(s) allegedly sold to T.Z. by Mr. Broeker. Nor did the government present any physical or documentary evidence establishing such a nexus.").

However, we find that the government's evidence overwhelmingly supports Broeker's conviction. The evidence shows that Broeker sold fentanyl to T.Z. approximately 30 minutes prior to T.Z.'s first overdose and, after returning home from the hospital, T.Z. did not have access to a car or any electronics. From this, a reasonable jury could conclude that T.Z. could not have contacted a second supply source prior to his death and, after returning from the hospital, ingested only the fentanyl distributed by Broeker. Additionally, the jury heard testimony that the half-clear, half-black capsules Fedke removed from T.Z.'s bedroom matched those sold by Barton on Broeker's behalf. And although the toxicology reports disclosed

the presence of multiple drugs in T.Z.'s system at the time of his death, Dr. Riley testified that the level of fentanyl in T.Z.'s system could have, by itself, caused T.Z.'s death, and Dr. Norfleet testified that T.Z.'s cause of death was fentanyl. This evidence certainly supports the finding that the fentanyl Broeker distributed was an independently sufficient cause of, or at least a but-for cause of, T.Z.'s death. See Burrage, 571 U.S. at 218-19 (requiring the government to show that the distributed controlled substance was either an independently sufficient or a but-for cause of the victim's death). We conclude that a reasonable jury could have found Broeker guilty beyond a reasonable doubt, and therefore, reversal of the district court's denial of Broeker's motion for acquittal is inappropriate.

Turning to Broeker's motion for a new trial, Broeker once again contests the sufficiency of the evidence, asserting that a new trial is necessary because the jury's verdict is contrary to the weight of the evidence. Further, he argues that the standards governing motions for acquittal and motions for new trials are different, so even if he cannot succeed on his sufficiency-of-the-evidence argument under Rule 29(a), a new trial under Rule 33 is warranted. See, e.g., R. Doc. 150, at 2-4; Appellant Br. 29 ("This Court has held that if the reviewing court finds that even though there is 'abstract sufficiency of the evidence to sustain the verdict' it may set the verdict aside and grant a new trial if 'the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'" (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980))

Although Broeker is correct that the standards are slightly different, here this distinction is inconsequential, and we affirm the district court's denial of his motion for a new trial. In addition to the obvious differences between the language found in Rules 29(a) and 33 and the diverging standards of review applicable to denials of motions for acquittal and motions for new trials, our case law dictates that unlike with motions for acquittal, when reviewing motions for a new trial, the district court "need not view the evidence in the light most favorable to the verdict" but instead "may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." See Lincoln, 630 F.2d at 1319. The district court acknowledged this

standard before proceeding to its consideration of the evidence, and it ultimately concluded that Broeker's argument did not give rise to a basis upon which to grant his motion for a new trial. We find no error in this conclusion.

In addition to his sufficiency-of-the-evidence argument, Broeker also argues that because medical examiners routinely receive information directly from law enforcement, we should, as a policy matter, disavow this practice and find Drs. Norfleet and Riley not credible. See, e.g., Appellant Br. 30-31 ("Many times, medical examiners—who are responsible for making their own objective cause and manner of death determinations—are given the circumstances surrounding death only by law enforcement . . . . However, jurors are often not apprised of the fact that the required certainty for cause and manner of death for a death certificate is only that the probability of accuracy exceed fifty percent.").

It is our familiar practice not to reach arguments raised for the first time on appeal. See, e.g., Fleck v. Wetch, 937 F.3d 1112, 1116 (8th Cir. 2019). Broeker did not challenge the credibility of Drs. Riley and Norfleet in his arguments to the district court, nor did he present an argument that, as a policy matter, medical examiners' independence from law enforcement's investigations should be called into question. Because the district court was not given an opportunity to address this argument below, we will not pass upon it for the first time on appeal. See id. However, to the extent that this argument is an extension of Broeker's sufficiency-of-the-evidence argument, which is properly before us, we find it unpersuasive. Dr. Norfleet testified that he received T.Z.'s body following his death and performed an examination of that body, sending samples of blood, urine, and vitreous fluid from T.Z.'s body to Dr. Riley for testing. Dr. Riley testified that after receiving those samples, she analyzed them, looking for any drugs, either illicit or pharmaceutical. Nothing in the record supports Broeker's suggestion of impropriety; both Drs. Norfleet and Riley provided extensive testimony as to their findings, and the jury (at trial) and the district court (when reviewing Broeker's motion for a new trial) were permitted to gauge their credibility and reach a verdict accordingly. See Lincoln, 630 F.3d at 1319.

Broeker also argues that the district court erred by excluding "Exhibit B," an exhibit depicting five text messages obtained from T.Z.'s phone. On February 28, T.Z. texted a contact labeled "Bosno Plug" and asked, "U got anything." "Bosno Plug" responded, "No I don't g." T.Z. did not respond. These messages were exchanged almost simultaneously with T.Z.'s messages with Broeker in which Broeker indicated that he had "fenny." Exhibit B also depicted incoming text messages which were received by T.Z.'s phone after T.Z. had already died. These messages read, "Any perks?" and "P30s." The government objected to Exhibit B's admission, arguing that the text messages were irrelevant and prejudicial. The district court agreed and excluded Exhibit B. However, in his motion for a new trial, Broeker did not argue that the district court improperly excluded Exhibit B, and because he makes this argument for the first time on appeal, we decline to reach it. Fleck, 937 F.3d at 1116.

Finally, Broeker argues that the district court erred in limiting his cross-examination of Detective Percich. Detective Percich testified on direct examination that there are typically text messages associated with the drugs found on the scene or in the victim's system. Then, on cross-examination, Broeker attempted to ask Detective Percich if he had "presented . . . any evidence of the source of lorazepam" or if he "ever [found] the text messages associated with that purchase of lorazepam." The government first objected to this line of questioning on relevance grounds and then objected because Broeker's questioning assumed facts not in evidence. The district court sustained both objections. Broeker did not raise this cross-examination argument before the district court, and we decline to reach it for the first time on appeal. See id.[4]

_____

[4]The government characterizes Broeker's argument as also challenging the district court's decision to limit Broeker's cross-examination of Jacob Dodson, the digital forensic examiner for the St. Louis County Police Department. See Appellee Br. 44. However, we do not construe Broeker's mention of Dodson as a separate cross-examination argument. Instead, Broeker's only mention of Dodson can be found in the "Statement of the Case" section of his brief and not in his substantive argument. See Appellant Br. 15-16. Further, Broeker mentions Dodson only in

Therefore, in light of the abundant evidence against Broeker, discussed <u>supra</u>, and the stringent standard under which we review the district court's denial of Broeker's motion for a new trial, we find that the district court did not abuse its discretion in denying the motion for a new trial. <u>See</u> <u>Manning</u>, 875 F.3d at 410.

As a final matter, Broeker was indicted for distribution of fentanyl resulting in death (Count 1) and conspiracy to distribute fentanyl (Count 2) and was then convicted by a jury of both counts. However, the final presentence investigation report (PSR) and final judgment reflect a conviction for conspiracy to distribute fentanyl resulting in death (Count 1) and conspiracy to distribute fentanyl (Count 2). After reviewing the indictment, the jury's verdict, and the parties' briefing to this Court, the PSR and final judgment appear to contain an error in its description of Count 1. We therefore remand to the district court with directions to amend the judgment to conform with Broeker's indictment and the jury's verdict.

III.

For the foregoing reasons, we affirm but remand for correction of the final judgment.

_____

---

relation to his belief that the district court should have admitted Exhibit B. <u>See</u> Appellant Br. 16 ("Broeker argued that Exhibit B provided context for the messages Dodson was already questioned about by the Government as well as evidence of alternative sources of drugs available to T.Z.").