# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3524
_____

United States of America

*Plaintiff - Appellee*

v.

Jonas Ross III also known as Jonas Ross

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: January 15, 2021
Filed: March 8, 2021

_____

Before COLLOTON, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Kenneth Payer died of a fentanyl overdose on or about November 30, 2016. Following a bench trial, the district court[1] found Jonas Ross III guilty of distribution of heroin, fentanyl, and furanyl fentanyl resulting in Payer's death, in violation of 21

_____

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 851, and sentenced him to life imprisonment. Ross argues that the government failed to prove that he provided the fentanyl that caused Payer's death. We affirm.

Ross was a known heroin dealer in Davenport, Iowa, from whom law enforcement officers arranged two controlled purchases in July 2016. Ross sold 0.23 grams of heroin in the first transaction and 0.09 grams of heroin in the second. An August 2016 search of Ross's residence revealed digital scales and packaging material. Ross was arrested and released after he expressed his interest in cooperating with law enforcement as a confidential source. He thereafter decided against cooperating, whereupon a warrant was issued for his arrest.

Payer traveled from Fremont, Ohio, to Davenport on November 30, 2016. He placed a fifteen-minute en route call to Ross. Payer checked in at a Davenport motel at 6:00 p.m. and texted Ross at 6:02 p.m., asking that Ross meet him at the motel, which Ross agreed to do. Payer texted Ross again at 6:16 p.m., asking when he would arrive. Ross and Payer then exchanged the following texts:

| | |
|---|---|
| Ross: | You w[a]nt one or two |
| Payer: | If it[']s good make it two |
| Ross: | This shit is good bro |
| Payer: | Okay two is good |

Ross texted at 6:40 p.m. that he was on his way to meet Payer. Payer called Ross five minutes later, and they talked briefly. Ross placed another completed call to Payer at 8:08 p.m. At some point that evening, Ross delivered drugs to Payer.

Payer did not answer when Ross called him again at 9:01 p.m. Ross called Darice Stewart (the mother of two of his children) minutes later, asking her to check on someone at the motel "[t]o make sure he didn't overdose." Stewart went to the motel, but did not see Payer or knock on the door to his room. Ross placed another

-2-

unanswered call to Payer at 9:40 p.m. Ross called Stewart repeatedly on December 1, asking that she check on Payer, which she failed to do. Motel staff discovered Payer's body the next day. Paramedics arrived and confirmed Payer's death. Ross disconnected his cell phone number that day.

Law enforcement officers entered Payer's motel room to photograph the scene and investigate his death. They observed on the desk near Payer's body a torn and empty baggie, a small amount of white powder, a rolled up dollar bill, and an unopened package (a sealed plastic baggie) containing what they believed to be heroin. Officers collected this evidence, as well as Payer's cell phone. Lab analysis revealed the loose powder to be 0.008 grams of fentanyl and the package to contain 1.57 grams of a mixture of heroin, fentanyl, and furanyl fentanyl. A search of the cell phone showed that Payer had recently been in touch with Ross. Officers arranged a third controlled purchase from Ross in January 2017, during which he sold the confidential source 0.23 grams of a mixture of heroin, furanyl fentanyl, and acrylfentanyl.

The indictment alleged that Ross "did knowingly and intentionally distribute a mixture and substance containing a detectable amount of heroin, fentanyl, and furanyl fentanyl . . . and death and serious bodily injury resulted from the use of said substance." Ross was also charged with three counts of distribution of a controlled substance, related to the July 2016 and January 2017 controlled purchases. He pleaded guilty to those counts, which are not at issue on appeal.

Among the witnesses the government called to testify at trial were Stewart, several law enforcement officers, the criminologist who identified the drugs found in the motel room, and forensic pathologist Marcus Nashelsky, M.D., who conducted the autopsy. Dr. Nashelsky concluded that Payer died of fentanyl intoxication and that Payer had recently used heroin. Dr. Nashelsky explained that ingestion of a high dose of fentanyl or heroin can produce sudden unconsciousness or even death. He

testified that fluid had accumulated in Payer's lungs, indicating that Payer had experienced a prolonged period of deep unconsciousness before his death. The toxicology examination results revealed that Payer's iliac blood contained a high concentration of fentanyl and that his urine contained fentanyl, norfentanyl (a metabolite of fentanyl), and morphine (a metabolite of heroin). No furanyl fentanyl was detected.[2]

Testifying in his own defense, Ross admitted that he had sold Payer the unopened package of 1.57 grams of the three-drug mixture, but claimed that he had shorted Payer almost half a gram. Ross testified that Payer had been using drugs at the time of Ross's 7:00 p.m. arrival at the motel and that he had offered Ross some of the powder on the desk. Ross testified that he had accepted the offer, spoke with Payer for a couple hours, and left the still-living Payer around 9:00 or 9:30 p.m. Ross denied asking Stewart to check on Payer and denied knowing about Payer's death.

Ross argues that the government failed to prove that he distributed the fentanyl that caused Payer's death. We review *de novo* the sufficiency of the evidence resulting in a guilty verdict after a bench trial. See United States v. Morris, 791 F.3d 910, 913 (8th Cir. 2015) (standard of review). We view the evidence "in the light

---

[2]Dr. Nashelsky testified that furanyl fentanyl is a fentanyl analogue. The toxicology laboratory did not regularly test for furanyl fentanyl in 2016. When Dr. Nashelsky learned that the mixture of drugs found at the scene contained the fentanyl analogue, he ordered additional testing on Payer's iliac blood sample. It appears that no further testing was completed on the urine sample.

Dr. Nashelsky explained that iliac blood refers to blood collected from the large vein in the groin area of the body. Iliac blood is considered a peripheral blood specimen, which "tends to be more reflective of drugs and drug concentrations that were in the blood around the time of death." Urine samples differ from blood samples because the bladder acts as a reservoir that holds waste materials (including drugs) until they are expelled through urination.

most favorable to the verdict, upholding the verdict if a reasonable factfinder could find the offense proved beyond a reasonable doubt, even if the evidence rationally supports two conflicting hypotheses." Id. (quoting United States v. Huggans, 650 F.3d 1210, 1222 (8th Cir. 2011)).

Title 21 U.S.C. § 841(b)(1)(C) provides for enhanced penalties "if death or serious bodily injury results from the use" of a controlled substance that has been unlawfully distributed by a defendant. The phrase "results from" requires the government to prove but-for causality. Burrage v. United States, 571 U.S. 204, 218-19 (2014). Accordingly, the government must offer "proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." Id. at 211 (cleaned up); see United States v. Seals, 915 F.3d 1203, 1206-07 (8th Cir. 2019) (holding that the evidence established that the heroin distributed by the defendant was a but-for cause of the victim's overdose).

We conclude that a reasonable factfinder could find that Ross distributed the fentanyl that caused Payer's death. Payer called Ross on his way to Davenport, presumably to make arrangements to purchase heroin from Ross. Payer texted Ross minutes after checking in at the motel in Davenport, identifying the motel and room number, and soon ordered two grams from Ross. The timing of Payer's communications with Ross tends to show Payer's urgent desire to ingest drugs and undermines Ross's contention that Payer had drugs with him when he checked in at the motel. Although Ross maintains that he shorted Payer nearly half a gram, a reasonable inference from the evidence is that Ross delivered the two grams in two packages—the unopened package containing 1.57 grams and the opened, emptied package (the torn baggie) containing a smaller quantity.

As earlier recounted in greater detail, Ross's post motel-meeting behavior tends to show that Ross was aware at the time he left Payer's room that Payer had overdosed and was unconscious. Upon receiving no answer to his 9:01 p.m. call on

-5-

November 30, Ross called Stewart to check on Payer and repeated that request the next day. He disconnected his cell phone number on December 2, the day Payer's body was discovered.

That the trace amount of loose powder on the desk was pure fentanyl—and not the three-drug mixture of the unopened package—does not disprove that Ross distributed the drug to Payer. The drug-identifying criminologist testified that the 1.57 gram mixture was not a uniform blend of drugs, but rather a gray, rock-like substance with a white chunk in the middle. Moreover, although fentanyl was the cause of Payer's death, the toxicology examination indicated that he had recently used heroin. The evidence thus permits the reasonable inference that the smaller package contained a non-homogenous mixture of heroin and fentanyl, with 0.008 grams of pure fentanyl remaining unused on the desk. Dr. Nashelsky explained that Payer might have ingested furanyl fentanyl, as well, with the analogue going undetected either because the concentration was too low or the drug had fully metabolized. The government was not required to prove that Ross distributed two packages of chemically identical substances.

We disagree with Ross's contention that United States v. Ewing, 749 F. App'x 317 (6th Cir. 2018), is substantially similar to his case. In Ewing, the defendant had distributed fentanyl-laced heroin to the decedent. Id. at 319. Evidence at trial established that the decedent collapsed immediately after using drugs at about 8:00 a.m. and died shortly thereafter. Id. at 329. The defendant presented evidence that the absence of heroin or heroin metabolites in the decedent's blood rendered it unlikely that the decedent had ingested heroin around the time of his death and therefore had not died from the defendant's drugs. Id. Because the government offered no evidence to explain the absence of heroin, the reviewing court concluded that "the jury lacked sufficient evidence to conclude beyond a reasonable doubt that the heroin mixture sold by Ewing contained the fentanyl that caused [the decedent's] death." Id. at 330.

Although heroin was not detected in Payer's blood, Payer had experienced a prolonged period of deep unconsciousness, during which his body continued to metabolize the drugs he had used. Dr. Nashelsky explained that heroin metabolizes quickly, persisting in the bloodstream for mere minutes, but that Payer had likely used heroin in the hours before his death because morphine—a heroin metabolite—was present in his urine. The evidence presented here is thus distinguishable from that presented in Ewing, where the government had failed to explain the inconsistency between the lack of heroin or heroin metabolites in the decedent's blood and the defendant's distribution of fentanyl-laced heroin. The evidence in Ewing also established that the decedent "clearly had access to other illicit substances in the days and hours before his overdose death." 749 F. App'x at 330. No such similar access was shown here.

The judgment is affirmed.

_____