# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2733
_____

United States of America

*Plaintiff - Appellee*

v.

Jeffery Darnell Moore

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Southern
_____

Submitted: March 15, 2023
Filed: June 27, 2023
_____

Before SHEPHERD, ERICKSON, and GRASZ, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Jeffery Darnell Moore was indicted on four drug-related charges stemming from his involvement in a narcotics-distribution ring in Sioux Falls, South Dakota, which culminated in the overdose deaths of Elizabeth Wehrkamp and James Savage. Following a jury trial, Moore was convicted of one count of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846, and two counts of distribution of

fentanyl resulting in death, in violation of 21 U.S.C. § 841(a)(1). The district court[1] sentenced Moore to 240 months' imprisonment for conspiracy to distribute heroin and 420 months' imprisonment on each count of distribution of fentanyl resulting in death, with all terms to run concurrently. On appeal, Moore argues (1) that the district court erroneously admitted text messages between Wehrkamp and himself and (2) that the evidence is insufficient to convict him on any of the three counts of conviction. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

"We recount the relevant testimony and other evidence presented at trial in the light most favorable to the jury's verdict." United States v. Shavers, 955 F.3d 685, 688 n.2 (8th Cir. 2020).

Law enforcement's investigation of Moore began after Wehrkamp's overdose death on November 3, 2018. Wehrkamp had a history of substance abuse issues. For a time during mid-2018, she appeared to have them under control. However, around October 2018, her parents noticed signs that she was relapsing. On November 2nd, her father, Eldon DeBoer, became concerned when he could not reach her. The next day, DeBoer went to Wehrkamp's residence to check on her. When he arrived, he was met by Wehrkamp's minor son, who informed him that Wehrkamp was in the upstairs bathroom. DeBoer found her on the bathroom floor, unresponsive, and he called 911. Officers with the Sioux Falls Police Department (SFPD) arrived shortly thereafter. Despite their efforts, they were unable to revive Wehrkamp.

That same afternoon, SFPD forensic specialist Erin McCaffrey arrived to investigate. On the first floor, she found a cellphone, laptop, and a needleless syringe. On the second-floor bathroom's counter, she found several bags containing

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

syringes, an individual syringe, and a spoon with cotton in it. Subsequent testing revealed the presence of fentanyl and acetylfentanyl on the spoon. McCaffrey also searched Wehrkamp's car in the garage and found an ATM receipt for a withdrawal of $160 on November 2nd at 7:15 p.m. in Wehrkamp's purse. After thoroughly photographing the scene, McCaffrey took several items into evidence. Among these items was the cellphone found on the first floor.

Just a few days later, on November 5th, narcotics detective Patrick Mertes removed the cellphone from evidence to conduct a forensic extraction of it. However, the cellphone was passcode-protected, and he was unable to bypass the passcode. The next day, DeBoer picked up the cellphone and other electronic devices from law enforcement. He took them home with him and tried to gain access to the cellphone by guessing the passcode. He tried so many times that the cellphone eventually reset and sent an email with a passcode to Wehrkamp's email address. DeBoer had access to Wehrkamp's email, and he used the passcode to then gain access to the cellphone.

Although the cellphone had reset, causing its call history and many applications to be deleted, a partial backup of the cellphone resulted in text messages being downloaded back onto the phone. DeBoer started reading the texts and, after noticing a series of messages between Wehrkamp and a specific 605-area-code number discussing a plethora of drug transactions, decided to return the cellphone to the police. DeBoer did not download anything, put anything on the cellphone, or manipulate it in any way.

On November 12th, DeBoer contacted Detective Mertes about the text messages and delivered the cellphone to him. Detective Mertes gave the cellphone to Anthony Buss, who at the time was a detective in the internet-crimes-against-children and forensics divisions. The next day, Buss conducted a forensic extraction on the cellphone, which essentially created an exact digital copy of it, and uploaded it to a secure drive location. He noticed no abnormalities nor any indication that information had been manipulated or added to the cellphone.

Subsequently, narcotics detective Peter Blankenfeld was assigned to the case. He began his investigation by analyzing the messages between Wehrkamp and the 605 number, a number which the police records system revealed to be a number associated with Moore. These messages ran from early October—right around the time DeBoer noticed Wehrkamp beginning to relapse—until the day after her death. They are replete with Wehrkamp's requests to purchase or exchange narcotics with Moore and Moore obliging shortly thereafter. Typically, Wehrkamp would request a specific amount, for example a "50 piece," or a "100 piece,"—which Detective Blankenfeld's training and experience led him to understand meant $50 or $100 worth of a particular drug—and the pair would complete the transaction in Moore's backyard or a nearby gas station. Moore often referred to accomplices in these messages, usually to explain his delays in getting drugs for Wehrkamp. Examples include, "[h]e just called me he don't get anymore tell next month," "[m]y main buddy was gone for a couple days," and "I will let you know when to come I just talked to my people."

Detective Blankenfeld focused most intently on a series of messages the day before Wehrkamp's death. Indeed, text messages exchanged on the morning of November 2nd showed that Wehrkamp met Moore at their usual meeting place, a local gas station, to purchase narcotics. But Moore did not have much to supply her with at that time, noting, "I only had a little bit am trying to get some more." Later that day, at 6:58 p.m., Wehrkamp texted Moore, "My son just picked up my shit and spilt it EVERYWHERE!!! . . . I NEED MORE!! Can [I] please meet you at [the gas station] with $150??? PLEASE!!??" The ATM receipt recovered from Wehrkamp's purse showed that roughly 20 minutes later, Wehrkamp withdrew $160. At 7:45 p.m., she texted Moore, "Back yard?" Just three minutes later she texted, "I'm in your back yard." Detective Blankenfeld found no other messages on the cellphone that indicated Wehrkamp was having similar conversations with anyone besides Moore. Thus, Detective Blankenfeld began investigating him.

At the same time, narcotics detective Danijel Mihajlovic was conducting an unrelated investigation into Moore, so the detectives joined forces. In the spring

of 2019, they conducted a series of trash pulls at Moore's residence. During the first, the detectives found several small, corner-cut baggies, which through their training and experience indicated not only the possession and usage of narcotics, but also its sale and distribution. After the second, they not only found more small corner-cut baggies, but they also found the larger portions of the bags with the corners missing. In the detectives' training and experience, the presence of the larger portions indicated repackaging of the drugs. At least one of the bags field-tested positive for cocaine. Not long after the second trash pull, the detectives executed a search warrant at Moore's house. During the search, they found .34 grams of heroin mixed with tramadol and fentanyl.

Little more than a week after the detectives executed the search warrant at Moore's home, another Sioux Falls resident, James Savage, died of a fentanyl overdose. On June 15, 2019, the day before his death, Savage and Hailey Cheever, Savage's long-distance girlfriend, exchanged numerous contentious text messages. In one message, Savage begged Cheever to call him. When she did not respond as quickly as he wanted, he warned, "I know what wont turn its back on me," and "I will do enough heroin to kill ten armys if you don't call me tonight." Cheever replied only sporadically, to which Savage responded by saying, "I'm at the end of my rope and could really use my 'wife' otherwise I'm go meet Greg." Cheever interpreted this as a reference to Greg Nordquist, a friend from Savage's past with whom Savage used to do heroin.

That same day, Nordquist—who had purchased heroin from Moore "countless" times over the years, including "every day" during one period—started his morning by purchasing a user amount of heroin from Moore. Later that evening, Savage contacted Nordquist to ask if Nordquist knew where to get any heroin. Nordquist responded that he did. Savage asked, "How much to get wrecked," to which Nordquist replied, "[It's] fire white. Aint no trash." "White," according to Detective Mihajlovic, is a reference to "China White,"—the purest form of heroin available—which, at the time, was known to be commonly mixed with fentanyl.

Ultimately, Savage requested $300 worth of heroin. Nordquist responded, "I aint making anything on that so your helping me tho," to which Savage replied, "Yeah bro for sure you think I'm do it alone[?]" Nordquist then set up a deal with Moore to purchase a gram for $300. Nordquist and Savage met at an ATM around 10:30 p.m., where Savage withdrew $300 and got in Nordquist's car. The pair then drove toward Moore's house, but Nordquist decided to drop Savage off at a nearby corner because he had "never brought no one to [Moore's] house before." Nordquist then drove to the back of Moore's house and exchanged Savage's $300 for a gram of narcotics. Nordquist afterward picked up Savage and drove the pair back to Savage's house.

At Savage's house, the pair went down to the basement and "did up [their] heroin." Savage did his slightly before Nordquist, and Nordquist observed Savage pass out before passing out himself. Hours later, Nordquist awoke to find Savage, still in his chair, deceased. Nordquist then "panicked," took evidence, and left.

The next morning, Cheever tried to call Savage multiple times. When he failed to answer, she called her brother-in-law, Ryan Rezac, and asked him to go to Savage's house to check on him. Rezac arrived at the house, noticed that Savage's car was not there, and after no one answered the door, he left. Rezac's wife convinced him to check on Savage a second time, instructing him to go inside the house. Rezac again got no response but was able to enter the house through an unlocked basement window, where he found Savage stiff in a chair. Rezac called 911. Rezac noticed a spoon and a needle on the table right in front of Savage, and because he was not sure whether Savage was dead and wanted to keep him out of trouble, Rezac hid these items underneath Savage's bed.

Law enforcement arrived and confirmed that Savage was deceased. They spoke with Rezac who told them about his suspicions of Nordquist's involvement and the syringe and spoon which he had hidden. SFPD forensic specialist Brianna Anderson later arrived on the scene to investigate. Among other items, she documented a piece of plastic packaging with an unknown residue as well as the

syringe and spoon Rezac had attempted to hide. Forensic testing confirmed that all three of these items contained fentanyl. That same day, Cheever reported her conversations with Savage to Detective Mihajlovic and informed him of her suspicions of Nordquist's involvement. As a result, Detective Mihajlovic expanded his investigation to include Nordquist.

Over the next several weeks, Nordquist continued to purchase heroin and other narcotics from Moore. Text messages between Nordquist and Moore reveal a similar thread as presented in the text messages between Wehrkamp and Moore. Nordquist similarly asked for specific amounts of drugs, and he sometimes met Moore in Moore's backyard to complete transactions. As was the case with Wehrkamp, Moore often made references to his accomplices in these messages, typically in explaining delays to Nordquist. Examples include, "just waiting for him," "waiting for them," "we have it before then," and "she not off yet."

Then, on July 24, 2019, while conducting surveillance, Detective Mihajlovic observed Nordquist leave his apartment, drive to an ATM machine, and return to his apartment. Shortly after, Moore arrived at Nordquist's apartment building. Nordquist came out, the two met briefly—in what Detective Mihajlovic suspected was a short-term stop, or drug transaction—and Nordquist went back inside. Based on Detective Mihajlovic's surveillance, officers obtained and executed a search warrant on Nordquist's apartment and found what they suspected to be heroin. Field testing revealed that the substance was actually fentanyl.

Meanwhile, the detectives continued to investigate Moore. In January 2020, they observed Moore leaving an apartment building where later cooperating witness, C.D., resided—an address known for narcotics sales—and throw two trash bags in the garbage. After searching the bags, the detectives found two small digital scales, which are commonly used to weigh drugs. The scales were extremely clean, "as if they'd been wiped down or cleaned prior to being thrown away." As Moore drove away from the residence with a woman, Shavetta Johnson, in the passenger seat, the detectives pulled him over and placed him under arrest for outstanding warrants.

## II.

A federal grand jury returned an indictment on July 20, 2020, charging Moore with conspiracy to distribute cocaine base, conspiracy to distribute heroin, and two counts of distribution of fentanyl resulting in death. He pled not guilty and proceeded to trial.

At trial, witnesses testified to all the facts outlined above. In addition to his testimony about conducting the extraction of Wehrkamp's cellphone, then-detective Buss also testified as an expert regarding what happens to cellphones when they are reset and go through a backup. Explaining the process, Buss ultimately testified that, although call history and text messages may have been lost in the reset, those messages that were properly backed up are accurate records of what existed on the cellphone prior to the reset, and nothing could have been added that was not already there.

When the government tried to introduce the text messages between Wehrkamp and Moore, Moore objected, arguing that the messages were inadmissible because the government did not provide adequate foundation of the chain of custody. More specifically, he argued that the evidence was not in "substantially the same condition" as when the police initially took the cellphone into custody due to the reset. The government responded by pointing the district court to the chain of custody from forensic specialist McCaffrey to Detective Mertes to DeBoer back to Detective Mertes and finally to then-detective Buss. The government emphasized Buss's expert testimony that the cellphone information retrieved from the backup was "an accurate record [and] that the times and the information wouldn't have been altered." The government concluded that, "the issues that [Moore] has addressed . . . go to the weight and not the admissibility of the evidence."

Ultimately, the district court agreed with the government and overruled Moore's objection. Because "[w]hat the government [was] offering . . . is

information that was restored to the phone from the cloud through the backup process," the district court found that there was "a reasonable probability that the information retrieved was substantially in the same state as when it was found at the scene." The district court concluded that "the objections of the defendant go to the weight and not the admissibility."

Later during the trial, several cooperating witnesses testified to Moore's involvement in narcotics trafficking. Nordquist testified that since he met Moore in 2017, he had purchased heroin from him "countless times," at one point "every day." When the government asked Nordquist whether he could tell if Moore was working with others that were helping him sell heroin, he responded that he often saw Moore driving around with a woman, and on at least one occasion, the woman handed Nordquist a bag of heroin he ordered from Moore.

J.U., an individual involved in selling heroin and fentanyl in Sioux Falls, testified to similar interactions with Moore. J.U. testified that he purchased heroin and fentanyl from Moore "maybe 50 times," and that a woman named "Yvette or Shavette" was sometimes with Moore during these transactions. During these transactions, J.U. testified, "I would give the money, and she'd just give me the stuff; or I'd give her the money, and [Moore would] give me the stuff." J.U. described Moore and the woman's relationship as a "user relationship" in which the pair would "pool their money together in order to buy a quantity to sell." J.U. also testified more broadly about the narcotics ring he and Moore were involved in. As to the organization's structure, J.U. testified that he and a few others, including Moore, would get "stuff" from C.D., "[a]nd then [they] had [their] own little circles that [they] distributed smaller quantities out to."

C.D. corroborated much of J.U.'s testimony. C.D. testified that at the height of his operation, he was selling 100 grams of heroin and fentanyl a week to various distributors, one of whom was J.U. C.D. testified that he also sold heroin and fentanyl to Moore. C.D. estimated that for a period of three or four months, he sold "user amounts" to Moore three times a week. C.D. believed, based on rumors, that

Moore was also purchasing from William Campbell, one of C.D.'s primary fentanyl suppliers.

Finally, Dr. Kenneth Snell, a forensic pathologist and Minnehaha County coroner, testified that "the cause of death for Elizabeth Wehrkamp [wa]s fentanyl and acetylfentanyl toxicity." Likewise, he testified that "[t]he cause of death of James Savage [wa]s fentanyl and acetylfentanyl toxicity."

After the government rested, Moore moved for judgment of acquittal on all counts, arguing that the evidence was insufficient to sustain a conviction on any one of them. The district court denied the motion. Ultimately, the jury found Moore guilty of conspiracy to distribute heroin and guilty of both counts of distribution of fentanyl resulting in death, but it acquitted him on the conspiracy-to-distribute-cocaine-base count. Moore appeals, arguing that the district court erroneously admitted his text messages with Wehrkamp and that the evidence is insufficient to convict him on any of the three counts of conviction.

III.

We begin by analyzing the district court's admission of the text messages between Wehrkamp and Moore. "We review a district court's rulings on the admission of evidence on a clear abuse of discretion standard." United States v. Miller, 994 F.2d 441, 443 (8th Cir. 1993). "'[O]nly when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict' will we reverse." United States v. Aungie, 4 F.4th 638, 644 (8th Cir. 2021) (citation omitted). "The admission of evidence can be affirmed on any basis supported by the record." United States v. Needham, 852 F.3d 830, 836 (8th Cir. 2017).

Moore's primary argument is that the government did not establish an adequate chain of custody since "the evidence was not in the same condition as it was during its owner's use and the government was not able to show that the

condition of the phone was substantially unchanged." Appellant Br. 11. However, chain-of-custody objections are generally limited to real or physical evidence—things like drugs, weapons, clothing, even cellphones—not text messages, which are more akin to writings. See, e.g., Miller, 994 F.2d at 443 (describing chain-of-custody framework in reference to propriety of admitting a match box containing cocaine base into evidence); United States v. Wilson, 565 F.3d 1059, 1065-66 (8th Cir. 2009) (entertaining chain-of-custody objection when lodged at admission of actual cellphone into evidence); see also Fed. R. Evid. 1001(a) (defining "writing" as "letters, words, numbers, or their equivalent set down in any form"). And here, the district court admitted an extraction report of text messages on the cellphone—not the actual cellphone—into evidence. Thus, we are not convinced that the chain-of-custody framework applies.

Nonetheless, we acknowledge that the government would not have obtained the text messages from the cellphone without the series of events leading to Moore's chain-of-custody objection. And the government fails to argue that the text messages are distinct from the cellphone. However, even assuming that the chain-of-custody framework applies here, Moore fails to demonstrate that the district court abused its discretion in admitting the text messages.

"The criteria governing admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed." United States v. Roberts, 503 F.2d 453, 456 (8th Cir. 1974). "The district court may admit a piece of physical evidence if it is satisfied that there is a reasonable probability [that] such evidence has not been changed or altered." Miller, 994 F.2d at 443. "Factors to be considered in making the determination of admissibility include the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of others tampering with it." Roberts, 503 F.2d at 456. Generally, "any defect in the chain of custody goes more to [the] weight [of the evidence rather] than its admissibility." United States v. Briley, 319 F.3d 360, 363 (8th Cir. 2003).

During the trial, the government elicited testimony from all the individuals involved in the handling of the cellphone and laid out a specific timeline. After forensic specialist McCaffrey found the cellphone at the scene of Wehrkamp's death, she took it into evidence. It remained there until Detective Mertes returned it to DeBoer. DeBoer then retained possession of the cellphone for a few days while he attempted to gain access to it. When he finally did, he returned the phone to law enforcement, at which time they conducted a forensic extraction of what remained after the reset and backup.

Further, while testifying as an expert witness, then-detective Buss stated that, although some data may have been lost in the reset, those text messages that were properly backed up are accurate records of what existed on the cellphone prior to the reset, and nothing could have been added that was not already there. In other words, the *text messages* on the cellphone following the reset and backup were in exactly the same state as they were at the time forensic specialist McCaffrey took the cellphone from the scene of Wehrkamp's death. Moreover, Moore makes no allegations that any of these messages were added to the phone, changed, or fabricated.

Under these circumstances, Moore's objection goes more to the weight of the evidence than its admissibility. See Briley, 319 F.3d at 363. Thus, we find no abuse of discretion in the district court's decision to admit the text messages between Wehrkamp and Moore into evidence. Cf. Wilson, 565 F.3d at 1065-66 (finding no abuse of discretion in district court's decision to admit cellphone despite nine-day period in which the cellphone was not in evidence and allegations that a police officer showed a witness images on the cellphone during that period).

IV.

Next, we address Moore's challenges to the sufficiency of the evidence. First, he contends that there is insufficient evidence to convict him of conspiracy to distribute heroin because "[w]hile some evidence of drug selling exists, the evidence

-12-

is significant only for small buyer[-]seller agreements to fund his own addiction." Second, Moore argues that there is insufficient evidence to convict him of either count of distribution of fentanyl resulting in death because, as to Wehrkamp, there is a lack of "any information about the life that [she] lived during her last eighteen hours before she overdosed," and, as to Savage, Nordquist was not a credible witness and Savage likely obtained fentanyl from another source.

Initially, the government argues that the standard of review for these challenges is plain error, arguing that Moore did not "preserve a specific argument regarding sufficiency of the evidence in [his] motion for judgment of acquittal," pointing to our decision in United States v. Two Hearts, 32 F.4th 659 (8th Cir. 2022). Appellee Br. 27. But Two Hearts stands only for the proposition that when a new ground for acquittal—one not raised in a previous motion for acquittal which lodged other, specific grounds—is raised for the first time on appeal, we will review that new ground for plain error. 32 F.4th at 664. Thus, here, where Moore raised a blanket sufficiency challenge to all counts of conviction before the district court and has done the same on appeal, Two Hearts is inapposite.

Thus, "[w]e review the denial of [Moore's] motion for acquittal *de novo*." United States v. Samuels, 611 F.3d 914, 917 (8th Cir. 2010) (citation omitted).

> We employ a strict standard of review regarding denials of motions for acquittal, viewing the evidence in the light most favorable to the guilty verdict, resolving all evidentiary conflicts in favor of the government, and accepting all reasonable inferences supported by the evidence. A jury verdict will not lightly be overturned and we will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt.

United States v. Donnell, 596 F.3d 913, 924 (8th Cir. 2010) (citation omitted). "A conviction may be based on circumstantial as well as direct evidence." United States v. Seals, 915 F.3d 1203, 1205 (8th Cir. 2019).

-13-

A.

First, we consider whether there was sufficient evidence to sustain Moore's conviction for conspiracy to distribute heroin. "To establish that a defendant conspired to distribute drugs, the government must show that there was an agreement to distribute drugs, that the defendant knew of the conspiracy, and that the defendant intentionally joined the conspiracy." United States v. Ramirez, 21 F.4th 530, 532 (8th Cir. 2021) (citation omitted). "An agreement to join a conspiracy to distribute a controlled substance need not be explicit and can be inferred from the facts of the case." United States v. Myers, 965 F.3d 933, 937 (8th Cir. 2020) (citation omitted). The conspiracy "may rely on a loosely knit, non-hierarchical collection of persons who engaged in a series of transactions involving distribution-quantities of drugs in and around a particular city over a course of time." Id. (citation omitted).

Importantly, in conspiracy-to-distribute cases, "we distinguish between a conspiracy and a mere 'buyer-seller' relationship. Evidence of 'a single transaction . . . involving small quantities of drugs consistent with personal use' is consistent with a 'mere buyer-seller relationship.' However, evidence of multiple transactions is evidence of a conspiracy." United States v. Rodriguez, 984 F.3d 704, 708-09 (8th Cir. 2021) (alteration in original) (citations omitted); see also Donnell, 596 F.3d at 925 ("[A] reasonable jury can find that a defendant has more than a mere buyer-seller relationship 'if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers,'" i.e., "where the drugs were purchased for resale" (citations omitted)).

Here, there is more than enough evidence to support Moore's conviction for conspiracy to distribute heroin. At trial, J.U. and C.D. testified to their involvement in a heroin-and-fentanyl distribution ring in which Moore both bought and sold the drugs. Further, multiple witnesses testified about purchasing heroin from Moore for years. Indeed, J.U. testified that he purchased heroin and fentanyl from Moore "maybe 50 times." Nordquist testified that after meeting Moore in 2017, he purchased heroin from him "every day" for a period. Indeed, even after Savage's

-14-

overdose death, Nordquist continued to purchase heroin from Moore for another month.

Additionally, both J.U. and Nordquist testified that Moore often had a woman with him assisting in his operations, going so far as to cite specific experiences in which she was directly involved in their transactions. J.U. further described Moore and the woman's relationship as one in which the pair would "pool their money together in order to buy a quantity to sell."

Moreover, the detectives saw the woman with Moore as he was leaving C.D.'s house, after having deposited digital scales—commonly associated with drug distribution—in the nearby dumpster. During this same investigation, the detectives, after conducting trash pulls at Moore's residence, found baggies—one of which tested positive for cocaine—consistent with the repackaging of drugs for sale and distribution. They also found heroin in Moore's house after executing a search warrant. And, of course, their investigation uncovered the messages between Wehrkamp and Moore, which were replete with conversations concerning drug transactions between October and November 2018. The messages also indicated that Moore was working with others. Indeed, Moore frequently referred to accomplices in these messages, as he similarly did throughout his messages with Nordquist.

In sum, the evidence at trial established the following: (1) Moore was involved in a heroin-and-fentanyl trafficking ring in Sioux Falls; (2) Moore sold heroin regularly to multiple people for years; (3) Moore worked with several accomplices, most importantly a woman, with whom he pooled his money together in order to buy larger quantities to sell; and (4) during their investigation of Moore, detectives found multiple pieces of evidence consistent with his distributing heroin. This is more than sufficient evidence for a reasonable jury to find Moore guilty of conspiracy to distribute heroin beyond a reasonable doubt. Cf. United States v. Harris, 966 F.3d 755, 761 (8th Cir. 2020) (holding that there was sufficient evidence to support defendant's conviction when "the facts showed (1) ongoing heroin sales, (2) over

-15-

the course of many months, (3) with significant, and even daily frequency, and (4) involving multiple individuals"). Contrary to Moore's contention, "this is simply not a case involving a 'single transient sales agreement and small amounts of drugs consistent with personal use.'" Id. (citation omitted).

## B.

We now move to the two counts of distribution of fentanyl resulting in death. "To sustain the guilty verdict, the [g]overnment must have proved that (1) the defendant knowingly or intentionally distributed a drug; and (2) the victim died or sustained a serious bodily injury caused by the use of the drug." United States v. Cathey, 997 F.3d 827, 832 (8th Cir. 2021). "[T]he government must offer 'proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." United States v. Ross, 990 F.3d 636, 639 (8th Cir. 2021) (citing Burrage v. United States, 571 U.S. 204, 211 (2014)). As to both Wehrkamp's and Savage's deaths, Moore does not dispute Dr. Snell's expert testimony that they died of fentanyl and acetylfentanyl toxicity. Rather, Moore argues only that there is insufficient evidence that he distributed the fentanyl that killed them.

i.

As to Wehrkamp's death, Moore argues that no reasonable juror could have convicted him on this count because "[t]he evidence shows that Wehrkamp spent time with someone, drank alcohol, and received a batch of drugs from someone in the early hours or morning of November 4th, 2018, and it was not Jeffrey [sic] Moore." But when reviewing the sufficiency of the evidence, the question is not whether there is a plausible theory that the defendant was not the perpetrator—it is whether a reasonable jury could have convicted the defendant based on the evidence presented. See Harris, 966 F.3d at 762 ("Whether [Moore's] or someone else's [fentanyl] caused [Wehrkamp's] overdose 'created a factual issue for the jury to resolve . . . .'" (citation omitted)).

-16-

A reasonable jury could convict Moore of distribution of fentanyl resulting in Wehrkamp's death. The text messages between Wehrkamp and Moore revealed that, from at least October 22, 2018, to November 2, 2018, Wehrkamp purchased what she believed to be heroin from Moore many times. Detective Blankenfeld testified that he found no other messages on the cellphone that indicated Wehrkamp was having similar conversations with anyone besides Moore. At trial, witness testimony revealed that Moore purchased both heroin and fentanyl from various individuals—often interchangeably—before reselling much of this product to feed his own addiction. Following the execution of a search warrant at Moore's home in early 2019, investigators found .34 grams of heroin mixed with tramadol and fentanyl. Further, "heroin" that Moore sold to Nordquist shortly after Savage's overdose death field tested positive for fentanyl.

As to the specific timeline leading up to Wehrkamp's death, on the morning of the day before her overdose, November 2nd, Wehrkamp met Moore at their usual gas station to purchase narcotics. Later that day, at 6:58 p.m., Wehrkamp texted Moore desperately seeking an additional $150 worth. Approximately 20 minutes later, Wehrkamp went to the ATM and withdrew $160. At 7:45 p.m., she texted Moore, "Back yard?" Just three minutes later she texted, "I'm in your back yard."

Further, messages between Wehrkamp and her family about a quarter after 8:00 p.m. that night reveal that after she met Moore at his house, she went back home and was playing with her minor son. The last message she sent was to Moore at 9:06 p.m., which was a question about a cryptic message he had sent. The very next day, November 3rd, shortly after 12:30 p.m., DeBoer arrived at Wehrkamp's house to find her unresponsive and foaming at the mouth. First responders pronounced her dead shortly thereafter. And, of course, subsequent testing of the spoon next to the uncapped syringe on the bathroom counter revealed the presence of fentanyl and acetylfentanyl.

A similar timeline was sufficient to support a defendant's conviction for distribution of fentanyl resulting in death in Ross. There, a drug customer traveled

from Ohio to Iowa and called the defendant on the way, "presumably to make arrangements to purchase heroin." Ross, 990 F.3d at 639. The customer texted the defendant the name of the motel and his room number, and when the defendant asked him whether he wanted one or two, the customer responded, "If it[']s good make it two." Id. at 638 (second alteration in original). Only thirty minutes later the defendant texted the customer that he was on his way. Id. Hours later, the defendant contacted a third party and asked her to check on the customer to "make sure he didn't overdose" at the motel. Id. Motel staff found the customer's dead body the next day. Id.

Although Moore did not call someone to check on Wehrkamp after selling her $150 worth of narcotics, this case is otherwise very similar to Ross. Indeed, as in Ross, the night before her overdose, Wehrkamp texted Moore—her primary if not only supplier of narcotics—at 6:58 p.m. "presumably to make arrangements to purchase heroin." Id. at 639. Per their typical arrangement, Wehrkamp then withdrew the necessary funds from an ATM and drove to Moore's house, texting him at 7:48 p.m. that she was in his backyard. Her subsequent text messages to family members reveal that she then went home. And as in Ross, Wehrkamp's body was found the next day. Under these facts, a reasonable jury could conclude that Moore distributed the fentanyl that resulted in Wehrkamp's death.

ii.

Finally, we address Moore's challenge to the sufficiency of the evidence for his conviction for distribution of fentanyl resulting in Savage's death. During trial, Nordquist's meticulous, step-by-step testimony established that he used Savage's money to purchase $300 of "fire white" from Moore, a drug which at the time was commonly known to be mixed with fentanyl; Savage and Nordquist did the drug together; and Savage died from it. Of course, later testing of several items left at the scene, including the syringe and spoon which Rezac found lying on the table in front of Savage, revealed the presence of fentanyl.

"[A] jury verdict[ may be] based solely on the testimony of conspirators and cooperating witnesses." United States v. Lewis, 976 F.3d 787, 794 (8th Cir. 2020) (citation omitted). Here, Nordquist's testimony—which was corroborated by text messages, the testimony of other witnesses, and video evidence of Nordquist and Savage meeting at the ATM prior to heading to Moore's house—directly tied the narcotics he purchased from Moore to Savage's death. Moore's primary rebuttal is that Nordquist's testimony is not credible because Nordquist had a motive to lie: to cover his own tracks. But when reviewing the sufficiency of the evidence, we "must resolve credibility issues in favor of the verdict." Id. (citation omitted). The jury heard the testimony, and it chose to believe Nordquist and the corroborating testimony of other witnesses. Thus, we will not disturb Moore's conviction for distribution of fentanyl resulting in Savage's death.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

_____