# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-1372

_____

United States of America

*Plaintiff - Appellee*

v.

Jemel Foster

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central

_____

Submitted: December 13, 2023
Filed: June 20, 2024
[Unpublished]

_____

Before SMITH, Chief Judge,[1] GRUENDER and GRASZ, Circuit Judges.

_____

PER CURIAM.

---

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

Jemel Foster appeals his conviction for distribution of a controlled substance resulting in death, in violation of 21 U.S.C. § 841. Foster admits that he distributed fentanyl to the victim, but he argues that the government failed to prove that the victim used the specific fentanyl that he distributed. Because the evidence was sufficient for the jury to conclude that Foster distributed the fentanyl that caused the victim's death, we affirm the judgment of the district court.[2]

## I. *Background*

In December 2020, Kaleigh Walser traveled from Arkansas to Florida to fulfill part of a probation obligation. Her mother, Teresa Coleman, accompanied her. Upon her arrival, Walser was arrested and jailed. Coleman carried Walser's suitcase back to Arkansas. Coleman removed the dirty clothes from the suitcase, washed and repacked them, and then shipped the suitcase to a hotel in Florida in anticipation of Walser's release.

Walser was released from jail on January 10, 2021. Her father, Richard Thompson, and his girlfriend, Virginia Moore, picked her up that morning and took her to a hotel. Walser stayed in Moore and Thompson's room until around noon, when she moved into her own room. Walser and Moore visited each other's room throughout the afternoon. When Walser's suitcase arrived from Arkansas, Moore found Walser's phone in the suitcase, removed it, and charged it. The suitcase also contained Walser's prescription medications, Adderall and Xanax, but Moore removed them and dispensed the prescribed dosages to Walser as needed.

Walser, Thompson, and Moore went out together that night. Upon their return, Walser stayed in her own room. Thompson and Moore each saw Walser through her window during the night, as Walser had not drawn her blackout curtain. The next day, the three of them flew home to Arkansas.

---

[2]The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

Walser had a history of buying drugs from Foster. According to Walser's phone data, even before landing in Arkansas, she began texting Foster, listed as "J" in her phone contacts, about purchasing drugs. She told "J" she had $300; later she said she had $200 in cash and $100 on Cash App. Walser arranged to meet Foster at a Walgreens. After arriving in Arkansas, Thompson, Moore, and Walser stopped at the Walgreens because Moore wanted to buy cold medicine. Walser went inside, bought a pack of syringes, and then purchased drugs from Foster in the parking lot. Thompson and Moore knew nothing of Walser's drug purchase. Afterward, they took Walser to Coleman's home, and the three unpacked and separated their belongings, as Moore had stored some things in Walser's suitcase for the return trip. Thompson and Moore left Walser at Coleman's home. Thompson later said that throughout the day-and-a-half that the travelers spent together, Walser did not appear to be under the influence of any drugs.

Walser had a normal visit with her family that evening. Coleman last spoke to Walser around midnight and later testified that Walser did not seem to be under the influence of anything. Coleman set the house alarm that would activate if anyone opened a door or window. No alarm went off that night.

Tragically, the next morning, Coleman found Walser dead in the bathroom. Walser's blood tested positive for fentanyl, amphetamine (Adderall), nicotine, caffeine, chlorpheniramine (an antihistamine), and alprazolam (Xanax). Her blood contained 17 nanograms per milliliter of fentanyl. The medical examiner concluded that her cause of death was fentanyl, alprazolam, and amphetamine intoxication. But he noted that there were only therapeutic levels of alprazolam and amphetamine in her blood and testified that "[b]y far and away, the fentanyl is what caused this young lady to die." R. Doc. 178, at 54.

Coleman searched Walser's bedroom and found a pack of syringes, with one missing, and a piece of cotton in the cap of a pill bottle. Police found a syringe in a bathroom drawer, but the crime lab never identified any DNA evidence or drugs on the syringe. A technician in the medical examiner's office discovered two torn, tan

-3-

plastic bags of fentanyl in Walser's clothing; those bags contained a total of 0.726 grams of fentanyl of 4.1 percent purity. The fentanyl tested positive for quinine, which is used as a cutting agent.

A Drug Enforcement Administration (DEA) officer viewed the texts that Walser had sent to "J." He noted that Walser's phone did not contain any texts about purchasing fentanyl from any other source. Using Walser's phone, authorities texted "J" about buying more drugs at the same Walgreens. When Foster arrived at the Walgreens, police arrested him and found eight torn, tan plastic bags similar to the bags found in Walser's clothing. Seven of those bags contained a total of 3.55 grams of fentanyl of 4 percent purity; quinine was also present. Police also recovered a phone from Foster's car that contained the texts from Walser's phone. Foster's phone contained additional texts between Walser and Foster suggesting that a buyer-seller relationship had begun by June 2020.

Foster was charged with distribution of fentanyl resulting in death, in violation of 21 U.S.C. § 841. At trial, a DEA investigator testified that fentanyl is commonly cut with quinine and that, in 2020 and 2021, fentanyl was selling for about $200 per gram, or about $50 to $100 per half gram. Another DEA officer testified that antihistamines can also be used as cutting agents for fentanyl.

Additionally, Connor Carroll, a friend of Walser's, testified about his knowledge of Walser's drug purchases and use. Carroll described how he drove Walser from her home in Fayetteville to Little Rock two or three times a week to purchase fentanyl before Walser was incarcerated in Florida. Carroll began driving Walser for the drug runs because he was concerned for her safety, as Walser sometimes would use fentanyl before driving home and be under its influence. Carroll had only known Walser to purchase fentanyl from "J," save on one occasion, when she purchased from someone who themselves had obtained fentanyl from "J." Carroll identified Foster as "J."

At the end of the government's case in chief, Foster moved for a judgment of acquittal as to the "resulting in death" element. The district court denied Foster's motion, and the jury found him guilty. The court sentenced him to 360 months in prison. Foster appeals.

## II. *Discussion*
### A. *Standard of Review*

"We review de novo the denial of a motion for judgment of acquittal based on the sufficiency of the evidence. We look at the evidence in the light most favorable to the verdict and accept all reasonable inferences that can be drawn from the verdict." *United States v. Griffith*, 786 F.3d 1098, 1102 (8th Cir. 2015) (citation omitted). Furthermore, "[i]f evidence consistent with guilt exists, we will not reverse simply because the facts and the circumstances may also be consistent with some innocent explanation. Even where the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." *Id.* (cleaned up). We will hold that the evidence was insufficient "only if no reasonable jury could have found the accused guilty." *United States v. Sanders*, 341 F.3d 809, 815 (8th Cir. 2003). But when "the government's evidence is equally strong to infer innocence as to infer guilt, . . . the court has a duty to direct an acquittal." *United States v. Davis*, 103 F.3d 660, 667 (8th Cir. 1996) (quoting *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir. 1971)).

### B. *The "Resulting in Death" Element*

To obtain a conviction for distribution of drugs resulting in death, the government must prove that the victim's use of drugs distributed by the defendant was a but-for cause of the victim's death, unless the drug use was an independently sufficient cause. *Burrage v. United States*, 571 U.S. 204, 218–19 (2014). Foster admits that he sold fentanyl to Walser the evening before her death. But he argues that the government failed to prove that the fentanyl he sold was the same fentanyl that Walser used. Foster argues that if Walser had used the fentanyl he sold to her, she would have had quinine in her blood. He suggests that the fentanyl she used could have been stashed in her suitcase, hidden in Coleman's home, or obtained

through another secret buy between the time of Walser's release and her arrival at her mother's home. Foster's argument is unavailing.

We considered a similar sufficiency challenge in *United States v. Ross*, 990 F.3d 636 (8th Cir. 2021). In *Ross*, we affirmed a conviction for distribution of controlled substances resulting in death when the victim had purchased drugs from the defendant one evening and was found dead the next day. *Id.* at 637–38. The victim had called the defendant while traveling and then texted the defendant immediately after checking into a motel room. *Id.* at 637. Later texts suggested that the victim had agreed to buy two grams of drugs. *Id.* at 638–39. After the victim's death, police entered the victim's motel room and found pure fentanyl residue and an unopened package containing 1.57 grams of a fentanyl, heroin, and furanyl fentanyl mixture. *Id.* at 638, 640. The victim's blood tested positive for fentanyl, but not furanyl fentanyl. *Id.* at 638. The defendant admitted that he sold the unopened package, but he argued that he had shorted the victim and had *not* sold the pure fentanyl residue. *Id.* at 639. We noted that "[t]he government was not required to prove that Ross distributed two packages of chemically identical substances." *Id.* at 640. And the timing of the victim's contacts with the defendant demonstrated urgency, suggesting that the victim did not have other drugs in his possession. *Id.* at 639. This evidence was sufficient to convict Ross. *Id.* at 640.

Similarly, in *United States v. Moore*, we upheld a conviction when the victim had texted the defendant about buying narcotics the day before her death and police did not find any texts indicating that she had obtained narcotics from anyone else. 71 F.4th 678, 681, 683 (8th Cir. 2023). Prior to her final texts about buying narcotics, the victim had purchased narcotics from the defendant, but the victim's child had spilled the drugs. *Id.* at 683. The victim then texted the defendant, desperate for more drugs, and she withdrew money from an ATM and texted the defendant when she arrived in his backyard. *Id.* at 683, 690–91. When combined with other evidence of the defendant's drug dealing, these facts were sufficient to support the jury's finding that the narcotics the defendant sold caused the victim's death. *Id.* at 690–91.

And in *United States v. Broeker*, the victim had purchased fentanyl from the defendant and overdosed about 30 minutes later. 27 F.4th 1331, 1336 (8th Cir. 2022). While the victim was in the hospital, his roommate searched the victim's room and grabbed the victim's phone and some pills. *Id.* at 1333–34, 1336. The victim returned home that night and had no access to a car or a phone. *Id.* at 1336. He overdosed again the next morning and died. *Id.* at 1333, 1336. Police executed a controlled buy from the defendant's associate and recovered pills that matched some of the pills that the roommate had taken from the victim's room. *Id.* at 1334, 1336. The defendant argued that there was insufficient evidence to prove that the fentanyl he sold was the same fentanyl that killed the victim. *Id.* at 1336. But we held that the jury could have reasonably found that the victim had no opportunity to purchase additional drugs prior to his death. *Id.*

Here, like in *Ross*, *Moore*, and *Broeker*, the timeline supports the jury's conclusion that Foster sold the drugs that caused the victim's death. Walser purchased fentanyl from Foster the evening before her overdose, and there is no evidence that she purchased fentanyl from anyone else. As in *Moore*, text messages reveal only one drug source. Foster argues that Walser could have deleted texts related to another drug buy. But it seems unlikely that Walser would have kept the texts between her and Foster and yet tried to hide another drug buy from the same period by deleting texts. Also, like the victim in *Broeker*, Walser had little opportunity to purchase drugs from another source between the time that she purchased from the defendant and her overdose.

Furthermore, Carroll testified that he drove Walser to Little Rock two or three times a week to purchase fentanyl. He began driving her because she sometimes used the fentanyl before returning home and he feared for her safety. This testimony suggests that Walser did not usually stockpile fentanyl. Like the victim's urgency in *Ross*, here, Walser's urgency in seeking drugs shows that she likely did not have any drugs in her possession. *See Ross*, 990 F.3d at 639.

Testimony established that Walser did not have a supplier in Fayetteville, so it is possible that she was simply trying to arrange a purchase from Foster while she was in Little Rock. The conceivable alternatives to Foster as the source of the drugs she used, however, are improbable and lack evidence. The alternatives include that the fentanyl was (1) hidden somewhere in Coleman's home or a vehicle; (2) smuggled out of the jail in Florida; (3) obtained in another transaction after Walser's release, unbeknownst to her family; or (4) hidden in Walser's suitcase. None of these possibilities compare in likelihood to Foster's known sale on the day before Walser's death.

Walser's past frequent trips from Fayetteville to Little Rock indicate that she used one source and cast doubt on any possibility that she had a source in Florida. And her sobriety while staying in her own hotel room, when contrasted with her drug use on her first night back in Arkansas, suggests that she did not have any drugs in Florida. Furthermore, after her release, Walser had little opportunity to obtain fentanyl without the knowledge of her family.

Foster highlights the possibility that Walser had drugs in her suitcase. Although it is true that no one searched Walser's suitcase, Coleman removed and repacked Walser's clothes, and Moore removed medication and charged Walser's phone. Walser also had some of Moore's clothes stored in her suitcase for the return trip, indicating that Walser did not isolate her belongings from Moore's during the trip. If Walser had stored drugs in her suitcase, either Coleman or Moore likely would have found them.

Furthermore, Carroll testified that he had only observed Walser to purchase fentanyl from "J," except for on one occasion when she purchased fentanyl from someone who had purchased from "J." In *Broeker*, the evidence clearly demonstrated that the victim must have had drugs hidden somewhere, as he overdosed even after his roommate took his drugs. 27 F.4th at 1333. But the evidence was still sufficient to conclude that those hidden drugs came from the same source as the confiscated drugs. *See id.* at 1336. Here, the evidence shows that Walser likely

did not have any additional fentanyl hidden somewhere. But because Walser only had one source of drugs, even if there was fentanyl hidden in Walser's suitcase or Coleman's home, the jury could have permissibly concluded that it came from Foster.

Foster also argues that Walser's blood would have contained quinine if she had used the fentanyl that he sold to her. He relies on *United States v. Ewing*, 749 F. App'x 317 (6th Cir. 2018) (unpublished). In *Ewing*, the Sixth Circuit reversed a conviction when the evidence showed that the defendant had sold fentanyl-laced heroin to the victim, but the victim's blood only contained fentanyl, fentanyl metabolites, and cocaine metabolites, not heroin or heroin metabolites. *Id.* at 328–30. A defense expert indicated that the victim likely would have had heroin metabolites in his blood if he had used heroin in the hours before his death. *Id.* at 329. And the evidence showed that the victim had died shortly after using drugs. *Id.* Thus, the evidence indicated that the defendant's heroin was not the drug that killed the victim, but that the victim had another source of illicit drugs and had used some other fentanyl right before his death. *Id.* at 329–30.

*Ewing* is distinguishable. In *Ewing*, the evidence showed that the defendant sold heroin, but the victim's blood did not contain heroin. *Id.* Here, the evidence showed that Foster sold fentanyl to Walser and that he *sometimes* used quinine as a cutting agent. As the government points out, there is no evidence that Foster exclusively used quinine as a cutting agent. And the government did not need to prove that the fentanyl Walser used was chemically identical to that found in Foster's possession. *See Ross*, 990 F.3d at 640.

As discussed above, we have previously affirmed convictions when the evidence suggested only one drug transaction. Foster admits that he sold fentanyl to Walser the day before her death, and the evidence indicates that this was the only fentanyl she possessed. Two packages of fentanyl, containing a total of 0.726 grams, were found in Walser's clothing. Testimony at trial established that fentanyl was selling for about $200 per gram, or about $50 to $100 per half gram. And Walser's

texts indicated that Walser had at least $200 to spend. The jury could have inferred that she purchased about a gram of fentanyl from Foster and that 0.726 grams remained after she overdosed. Thus, the jury reasonably could have concluded that the fentanyl Walser purchased from Foster caused her death.

### III. *Conclusion*

Therefore, we affirm Foster's conviction for distribution of a controlled substance resulting in death.

_____