# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-1055
_____

United States of America

*Plaintiff - Appellee*

v.

Izeall T. Collins

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 15, 2024
Filed: July 30. 2024

_____

Before LOKEN, COLLOTON,[1] and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

A jury convicted Izeall Collins of possession of heroin with intent to distribute in violation 21 U.S.C. § 841(a)(1) and (b)(1)(A), and possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). The district

_____

[1]Judge Colloton became Chief Judge of the Circuit on March 11, 2024. See 28 U.S.C. § 45(a)(1).

court[2] sentenced him to 228 months imprisonment. Collins appeals, arguing the district court erred in denying his motion to suppress and erred in denying his motion for acquittal at the close of evidence because the evidence was insufficient to sustain his conviction. See Fed. R. Crim. P. 29(a). Reviewing these predominantly legal issues *de novo* we affirm.

## I. Background

On March 4, 2019, passenger Collins arrived at the Kansas City Greyhound bus terminal on a bus traveling from Los Angeles to New York City. Collins boarded the bus in Denver. His ultimate destination was Norfolk, Virginia. Members of the Missouri Western Interdiction & Narcotics Task Force (the MoWIN task force) were at the terminal when the bus arrived for cleaning and refueling. The MoWIN task force has seized large quantities of narcotics at the Kansas City terminal from passengers and luggage on Los Angeles to New York Greyhound buses.

At the Kansas City terminal, all passengers exited the bus. Detective Garcia, a member of the MoWIN task force, walked a drug detection dog around the bus to conduct an open-air sniff of the checked luggage compartments. Detective Wells, another member of the task force, watched the passengers from a nearby building. He noticed that Collins was watching Detective Garcia and the dog, and moved away from the protected smoking section in below-freezing temperatures to maintain a line of sight when Detective Garcia and the dog moved to the other side of the bus and then entered the bus. When Garcia and the dog left the bus, Collins reboarded. Suspecting Collins had reboarded to retrieve or dispose of contraband, Detective Wells positioned himself to see down the passenger aisle through the front

---

[2]The Honorable Gregory David Kays, United States District Judge for the Western District of Missouri.

windshield. Wells saw Collins walk down the aisle and inspect a seating area on the driver's side. Collins did not appear to deposit or retrieve anything.

When Collins exited the bus, Detective Wells described his observations of what he considered suspicious activity to other officers, including Detective Michael Nelson. Detective Nelson approached Collins, who was standing in line with other passengers waiting to reboard. Nelson smelled a strong odor of marijuana; in plain clothes, he presented his badge, explained that he was working in narcotics interdiction, and asked if he could speak with Collins. Collins said yes. Collins produced a Colorado driver's license and bus tickets. Detective Nelson asked Collins if he was carrying any contraband. Collins answered yes, and pulled out a tin can containing a "green, leafy substance" that Detective Nelson believed to be marijuana.

Detective Nelson asked if he could search Collins. Collins said yes. Inside Collins's front waistband, Detective Nelson felt a brick-like object he believed to be a package of illegal drugs. Nelson placed Collins under arrest and brought him to an office inside the Greyhound station. There, Nelson removed the brick-like object from Collins's pants and found what appeared to be drugs wrapped in cellophane and covered in duct tape. Another detective found U.S. currency and a live nine-millimeter bullet in Collins's jacket. Laboratory tests revealed that the package contained over one kilogram of heroin with a street value of $45,000 to $60,000.

Meanwhile, after finding no bags belonging to Collins with the bus's checked luggage, Detectives Wells and Garcia boarded the bus. They found a black backpack and blue cooler on an empty seat near where Wells saw Collins stop to look around when he first reboarded the bus. The backpack and cooler were not claimed by other reboarding passengers. Wells brought the backpack and cooler into the office, where Collins said they did not belong to him, and then back to the bus, where again no other passenger claimed them. A warrant search of the cooler yielded a loaded Kel-Tec 9-millimeter handgun that matched the 9-millimeter round found in Collins's

jacket. The backpack contained duct tape, a letter signed by "Izeall Collins," and clothing that matched the brand of the jacket that Collins wore when he was arrested.

## II. Suppression Issues

Collins moved to suppress evidence seized at the time of his arrest, arguing the MoWIN task force officers conducted a warrantless investigatory stop and search of his person without reasonable suspicion of criminal activity in violation of his Fourth Amendment rights. Following an evidentiary hearing, Magistrate Judge Lajuana M. Counts filed a Report and Recommendation concluding that Collins's Fourth Amendment rights had not been violated. The district court adopted the Report and Recommendation and denied the motion to suppress. We review the district court's legal conclusions *de novo* and its factual findings for clear error. United States v. Mitchell, 55 F.4th 620, 622 (8th Cir. 2022).

At the suppression hearing, Detective Wells testified that MoWIN task force officers regularly interdict Greyhound buses on the Los Angeles to New York route, which stops in Las Vegas and Denver, cities where large volumes of narcotics distributed throughout the United States originate. They have often seized contraband at the Kansas City terminal using the investigative procedures that resulted in the seizure of drugs and a firearm from Collins in this case.

Wells testified that he watched Collins exit the bus with the other passengers, then move around in sub-freezing weather to watch Detective Garcia's dog sniffing the checked luggage compartments, then move to where he could see down the passenger aisle when Garcia and the dog entered the bus. Detective Wells testified that Collins's behavior was consistent with other bus passengers he had arrested when working interdiction; suspects visually inspect the area where they were sitting after a drug dog enters the bus to determine if "bags had been manipulated or if law enforcement had become aware of the contraband."

Detective Wells testified that he communicated his observations of this suspicious activity to other task force officers including Detective Nelson, who then approached Collins to speak with him as he was in line with other passengers to reboard the bus. Detective Nelson testified that he detected a strong odor of marijuana as he approached Collins. Nelson testified he identified himself and asked if he could speak to Collins, who said yes. Detective Nelson asked to see Collins's bus ticket and identification. Collins handed over the ticket and a Colorado driver's license. Detective Nelson observed that Collins appeared nervous, his hands were shaking, and he was sweating profusely despite the cold weather.

Detective Nelson explained to Collins that he was part of a unit which interdicts marijuana, cocaine, heroin, and fentanyl and asked Collins if he possessed any of those drugs. Collins said he possessed a small amount of marijuana and pulled a tin box containing what appeared to be marijuana out of his coat. Because of the marijuana, Detective Nelson decided to investigate further. Believing a search for weapons was necessary for safety purposes, he asked Collins if he could search him for weapons; Collins said yes. Reaching into Collins's front waistband area, Nelson felt a brick-shaped object that he recognized as illegal narcotics. He placed Collins under arrest. The brick-shaped object was found to contain approximately one kilogram of heroin. After Collins's arrest, Detective Wells went back on the bus and recovered items that another passenger indicated belonged to Collins.

Detective Nelson testified that he did not raise his voice, give an "aggressive command," use handcuffs, or display a weapon during his conversation with Collins. Detective Nelson determined that Collins was not free to go because of the marijuana on his person but did not communicate this to Collins. While he was being searched, Collins was heard saying on his cell phone, "They got me, they're arresting me now." The testimony of Detectives Wells and Nelson at trial was less extensive but consistent with their suppression hearing testimony.

On appeal, Collins does not point to contradictory trial evidence nor does he challenge the district court's findings of fact in denying his motion to suppress. Rather, he argues that "[t]he targeting of Mr. Collins as a subject of interest from the moment he stepped off the bus," and the officers ignoring reasonable alternative explanations for why he reboarded the bus after Detective Garcia and his dog exited, made this an "investigatory stop" without reasonable suspicion that criminal activity was afoot, an unreasonable seizure in violation of his Fourth Amendment rights.

As the district court recognized, the critical issue in this case is when the Fourth Amendment seizure occurred. The Supreme Court has explained:

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business' . . . the encounter is consensual and no reasonable suspicion is required.

Florida v. Bostick, 501 U.S. 429, 434 (1991) (citation omitted); see United States v. Lillich, 6 F.4th 869, 875 (8th Cir. 2021), cert. denied, 142 S. Ct. 1220 (2022). In most circumstances, the seizure test is whether a reasonable person would believe that he or she is not free to leave. See, e.g. Michigan v. Chesternut, 486 U.S. 567, 573 (1988). But bus passengers are different "because passengers on a bus have voluntarily placed themselves in a restricted area that they do not wish to leave." United States v. Graham, 982 F.2d 273, 274 (8th Cir. 1992):

> Accordingly, the "free to leave" analysis on which [Collins] relies is inapplicable. . . . The appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.

Bostick, 501 U.S. at 436-37.

Here, there was no interference with Collins's movements prior to Detective Nelson approaching Collins and asking questions. The open-air dog sniff of the checked luggage compartments beneath the Greyhound bus and of the passenger seating areas after passengers departed for a break did not trigger Fourth Amendment scrutiny. See United States v. Harvey, 961 F.2d 1361, 1362-63 (8th Cir.), cert. denied, 506 U.S. 883 (1992); cf. United States v. Va Lerie, 424 F.3d 694, 706-08 (8th Cir. 2005) (en banc), cert. denied, 548 U.S. 903 (2006). Nor was the Fourth Amendment violated when Detective Wells watched Collins after passengers left the bus. Wells observed Collins from a distance, in a public place where Collins had no reasonable expectation of privacy. Detectives Wells and Garcia then boarded the bus and inspected the area that Collins had paused to look around following the dog sniff. They in no way interfered with Collins's liberty. They conducted drug trafficking investigation consistent with the task force's regular interdiction procedures.

That a police officer suspects criminal activity when he approaches a person in a public place and asks questions does not violate the Fourth Amendment so long as the suspect's freedom to decline to cooperate is respected. See Bostick, 501 U.S. at 434. Collins does not argue that a reasonable person in his position would not have felt free to decline to cooperate. Thus, prior to Collins admitting that he was in possession of marijuana, whether there were "other reasonable explanations for [his] behavior" is irrelevant.

When Detective Wells reported what he considered suspicious activity to other task force officers, Detective Nelson approached Collins and asked to speak to him. They were in an open area outside the bus. There is no evidence Detective Nelson spoke aggressively, displayed his weapon, or blocked Collins's movement. The district court found that Detective Nelson's initial encounter with Collins was consensual. On appeal, Collins has failed to identify any evidence suggesting that the encounter was not consensual when Collins agreed to answer Nelson's questions.

We agree with the district court that the initial encounter was consensual. Therefore, we need not consider whether, even if not consensual, Detective Nelson's approach and questioning leading to the discovery and seizure of drugs and a firearm was a permissible Fourth Amendment investigatory stop supported by reasonable suspicion that Collins was engaged in criminal activity -- the interstate transportation of illegal narcotics. See, e.g., United States v. Quinn, 812 F.3d 694, 697 (8th Cir. 2016), citing Terry v. Ohio, 392 U.S. 1, 30 (1968). We note that a person's "unusual" behavior in the presence of law enforcement is relevant in determining whether an officer's suspicion is objectively reasonable. See United States v. LaGrange, 981 F.3d 1119, 1122 (8th Cir. 2020), cert. denied, 142 S. Ct. 246 (2021).

When Detective Nelson smelled marijuana and Collins admitted to possessing marijuana and produced a substance that appeared to be marijuana, Detective Nelson handcuffed Collins and placed him under arrest. An officer with probable cause may arrest a person without a warrant, United States v. Mathes, 58 F.4th 990, 993 (8th Cir. 2023), and may search him incident to the arrest. United States v. Robinson, 414 U.S. 218, 235 (1973).

Accordingly, we affirm the denial of Collins's motion to suppress.

### III. Sufficiency of the Evidence

Reciting the standard of review for challenging the denial of a motion for judgment of acquittal, Collins argues there is "reasonable doubt" as to his convictions and the government presented insufficient evidence to convict him of possessing heroin with intent to distribute and possessing a firearm in furtherance of a drug trafficking crime. We view the facts in the light most favorable to the jury's verdict and affirm if "a reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. LaRoche, 83 F.4th 682, 689 (8th Cir. 2023) (quotation omitted), cert. denied, 144 S. Ct. 858 (2024). "We apply the same standard

of review to the district court's ruling on a motion for judgment of acquittal." United States v. Broeker, 27 F.4th 1331, 1335 (8th Cir. 2022) (quotation omitted).

**A.** To prove Collins possessed heroin with intent to distribute, "the government must prove the defendant knowingly possessed the heroin and he intended to distribute it." United States v. Peebles, 883 F.3d 1062, 1068 (8th Cir.), cert. denied, 139 S. Ct. 265 (2018). Either actual or constructive possession will suffice. Intent to distribute can be shown through the quantity of drugs possessed alone. Id. Resolving all inferences in favor of the jury's verdict, the evidence is more than sufficient to support Collins's conviction for possession of heroin with intent to distribute. Detective Nelson testified that he found the package, which was later determined to be heroin, on Collins's person. One kilogram of heroin, at least 1,000 individual doses, is more than enough to establish intent to distribute. See Peebles, 883 F.3d at 1069 (holding that one quarter kilogram was sufficient to show intent to distribute).

**B.** To prove Collins possessed a firearm in furtherance of a drug trafficking crime, the government must prove he knowingly possessed the firearm found in the cooler left in the passenger seating area that he had reboarded the bus to inspect, and that a nexus existed between the firearm and his drug crime. United States v. Druger, 920 F.3d 567, 570 (8th Cir. 2019). Actual or constructive possession will suffice. United States v. Saddler, 538 F.3d 879, 888 (8th Cir.), cert. denied, 555 U.S. 1088 (2008). Constructive possession "requires evidence that a defendant knowingly has the power and intention to exercise control over the firearm." Id. (quotation omitted). Nexus may be shown in a variety of ways, including evidence "that tend[s] to show the use of firearms to protect drugs or drug proceeds, or to embolden traffickers generally in their receipt, storage, and distribution of drugs." United States v. Urbina-Rodriguez, 986 F.3d 1095, 1098 (8th Cir.), cert. denied, 142 S. Ct. 374 (2021).

At trial, the government presented testimony from an officer who works with a federal interdiction task force that drug traffickers often carry firearms to protect the drugs they are trafficking. Here, the firearm was found in a cooler that was unclaimed by any other passenger. The firearm was designed to fire the same caliber ammunition as the bullet found in Collins's jacket. The backpack, left next to the cooler and also unclaimed, contained a letter signed by Izeall Collins. Under our deferential review, this is more than enough to establish at least constructive possession of the firearm. Proof of nexus is sufficient "when [the firearm] is kept in close proximity to the drugs, it is quickly accessible, and there is expert testimony regarding the use of firearms in connection with drug trafficking." Druger, 920 F.3d at 570 (quotation omitted). At the scene, Collins was found in possession of a distribution quantity of heroin. A firearm was found in baggage containing other items identifying Collins as its owner. There was officer testimony that drug traffickers often carry firearms for protection. This evidence is sufficient to sustain the jury's verdict convicting Collins of both charges.

The judgment of the district court is affirmed.

_____